*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CV-403 & 12-CV-542

HAVILAH REAL PROPERTY SERVICES, LLC,
APPELLANT/CROSS-APPELLEE,

v.

VLK, LLC, ET AL.,
APPELLEES/CROSS-APPELLANTS.

Appeals from the Superior Court
of the District of Columbia
(CAB-2474-08)

(Hon. Todd E. Edelman, Trial Judge)

(Argued September 19, 2013                    Decided January 29, 2015)

*Eric M. Rome*, with whom *June L. Marshall* was on the brief, for appellant/cross-appellee.

*William J. Carter* for appellees/cross-appellants.

Before WASHINGTON, *Chief Judge*, BLACKBURNE-RIGSBY, *Associate Judge*, and NASH, *Associate Judge* of the Superior Court.[*]

BLACKBURNE-RIGSBY, *Associate Judge*:  This case presents a question of

first impression in the District of Columbia:  Whether the filing of a notice of *lis*

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (2001).

*pendens*[1] in connection with litigation over real property is protected by an absolute or a conditional privilege as a defense to a claim of tortious interference with contract and/or prospective advantage. Factually, this case is essentially about a bitter dispute between two companies over the right to purchase certain real properties for investment purposes, stemming, in large part, from the personal rivalry between the companies' owners over the attention of one man. Vicky Lynn Karen operated a business venture with her former romantic partner LaMar Carlson ("Carlson"), entitled VLK, LLC ("VLK"), to purchase distressed properties in the District of Columbia for resale to developers. At some point, Carlson started dating Joan A. Alderman ("Alderman"), who also owned a company, Havilah Real Property Services, LLC ("Havilah"), which was engaged in essentially the same type of business as VLK. Karen believed that Carlson was conspiring with Alderman to buy property that Karen was interested in having VLK purchase, thereby, in Karen's view, hurting VLK's business interests to the benefit of Havilah and Alderman.

---

[1] A *lis pendens* notice is "designed to enable interested third parties to discover the existence and scope of pending litigation affecting the title to or asserting a mortgage, lien, security interest, or other interest in real property." *Heck v. Adamson*, 941 A.2d 1028, 1029-30 (D.C. 2008) (citations, internal quotation marks, and brackets omitted).

Karen sued Carlson, Alderman, and Havilah in Maryland in connection with some of the business deals with which she claimed Carlson and Alderman had interfered. As part of the Maryland lawsuit, Karen filed *lis pendens* on fifty-one Havilah-owned properties in the District of Columbia. Karen ultimately lost the Maryland lawsuit against Alderman and Havilah, but won against Carlson for breaching his fiduciary duty to VLK. The case before us followed in the aftermath of the Maryland lawsuit when Havilah filed suit against VLK and Karen[2] in D.C. Superior Court, alleging that the lodging of *lis pendens* on thirty-one of the fifty-one Havilah-owned properties at issue in the Maryland lawsuit was in bad faith and without probable cause, and amounted to malicious prosecution and tortious interference with contract and/or prospective advantage.[3]

VLK filed motions for summary judgment on Havilah's claims of malicious prosecution and tortious interference. The trial judge granted summary judgment on the malicious prosecution claim, concluding that the filing of thirty-one *lis pendens* is not a recognized "special injury" necessary to maintain that cause of

---

[2] For purposes of this opinion, in general, appellees/cross-appellants VLK, LLC and Karen are collectively referred to as "VLK."

[3] Havilah's second amended complaint also alleged that the filings of *lis pendens* constituted an abuse of process, but that claim was abandoned prior to trial.

action. However, the trial judge denied summary judgment on the tortious interference claim, determining that such filings were only "conditionally privileged" in the District of Columbia and did not act as a complete bar against such a claim. Consequently, the jury rendered a verdict in favor of Havilah on the sole remaining claim and awarded damages of $602,942.

Both parties appealed. Havilah seeks reversal of the malicious prosecution decision, claiming that the filing of thirty-one *lis pendens* satisfied the "special injury" element. VLK filed a cross-appeal, seeking reversal of the tortious interference decision on the basis that *lis pendens* are protected by an absolute privilege, thereby protected from suit unconditionally. Alternatively, VLK argues, *inter alia*, that Havilah failed to present sufficient evidence that VLK had interfered with any of its specific business relationships, and that Havilah's damages resulting from the filing of *lis pendens* were incorrectly calculated.[4]

As we are presented with an issue of first impression in VLK's cross-appeal, we decide to first address VLK's arguments before analyzing Havilah's sole

---

[4] Additionally, VLK claims the trial court erred in admitting substantial amounts of hearsay into evidence and that Havilah failed to mitigate damages as a matter of law. See *infra* note 8.

contention.  Based on the forthcoming reasons, we affirm the trial court's various decisions and the jury's verdict and award.

We hold that, in the District of Columbia, the act of engaging in litigation is conditionally privileged against a claim of tortious interference with contract and/or prospective advantage, meaning that it is a complete defense to such a claim if the defendant can establish that the prior litigation asserted a legally protected interest in good faith.  If the prior litigation was pursued in good faith and therefore privileged, then the filing of a *lis pendens* ancillary to that litigation is also privileged.  The converse is also true; if the litigation was not pursued in good faith, then the *lis pendens* is likewise not privileged.  In other words, even if the jury is persuaded that an individual *lis pendens* may have been filed, in whole or in part, based on improper motives independent from the litigation, there can be no liability if the underlying lawsuit itself was asserted in good faith.  In this case, whether VLK filed the Maryland lawsuit in good faith was a factual question for the jury to decide, and the jury was entitled to conclude that the Maryland lawsuit was not pursued in good faith and therefore not a privileged act, and thus that VLK was liable for damages proximately caused by the prior litigation, including damages occasioned by the filing of the thirty-one *lis pendens* related to that litigation.

In addition, we conclude that there was sufficient evidence in the record that VLK's filings of notice of *lis pendens* interfered with Havilah's prospective business, and that the trial court correctly instructed the jury on how to calculate Havilah's damages. And, as to Havilah's appeal, we hold that the filing of thirty-one *lis pendens* in this case does not meet the high "special injury" standard needed to maintain a claim of malicious prosecution.

## I.     Factual Background

In 2004, Vicky Lynn Karen formed VLK, LLC. LaMar Carlson, with whom she had previously been in a romantic relationship, was a minority member in the company. VLK purchased distressed properties in Southeast Washington, D.C., and sold them to developers for profit. Between 2005 and 2006, VLK purchased five properties, two of which were formerly owned by a defunct company named FABCO Investment Company ("FABCO").[5] Karen claimed that VLK planned to purchase more FABCO properties, and that she and Carlson discussed a list of potential FABCO properties to purchase on many occasions.

---

[5] Although FABCO was a defunct company, VLK was able to purchase the two properties from the surviving widow of the last known officer and stockholder of FABCO, Anna Bulls.

In 2006, the business relationship between Karen and Carlson broke down and VLK filed suit against Carlson for, among other things, breach of fiduciary duty and conversion ("Carlson lawsuit"). Specifically, Karen alleged that Carlson refused to transfer title to five promissory notes that encumbered one of VLK's properties to VLK after having acted on VLK's behalf in negotiating assignment of those notes. Karen and Carlson subsequently entered into a settlement agreement, whereby Carlson agreed not to seek or undertake any efforts to directly or indirectly purchase real property within specifically marked regions ("Restricted Area") without providing VLK the "corporate opportunity"[6] to first purchase the

---

[6] The "corporate opportunity doctrine" provides that:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of [the] corporation, *the law will not permit [the officer or director personally] to seize the* [*business*] *opportunity*. . . . And, if, in such circumstances, the interest[s] of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests, and profits so acquired.

*Robinson v. R & R, Inc.*, 943 F. Supp. 18, 21 (D.D.C. 1996) (emphasis added) (quoting *Guth v. Loft*, 5 A.2d 503, 511 (Del. 1939)).

property. The settlement agreement was memorialized as an amendment to VLK's operating agreement and the Carlson lawsuit was dismissed without prejudice.

In early 2007, Carlson became romantically involved with Alderman, the principal member of Havilah. Havilah first purchased properties — lots which VLK had previously sought to purchase — in January 2007. By mid-2007, Havilah had rapidly purchased about fifty properties, most of them FABCO properties. Karen soon learned of Carlson's romantic relationship with Alderman, and suspected that Carlson and Alderman were also working together in a business capacity to purchase properties for Havilah using business strategies that she and Carlson had previously devised for VLK. Karen claimed that she entered into an oral agreement with Carlson, whereby he agreed to resume his former role in VLK. In exchange, Karen agreed to: "(1) dismiss the [Carlson lawsuit] with prejudice; (2) grant Carlson signature authority on VLK's bank account; and (3) rescind the Amendment [limiting Carlson's ability to independently purchase properties within the Restricted Area] to the Operating Agreement." Karen later discovered, however, that Carlson had not satisfactorily maintained his end of the bargain, because he transferred $10,000 from VLK's account to Havilah in consideration for a certain piece of property without Karen's knowledge or consent.

In November 2007, VLK initiated the Maryland lawsuit against Havilah, Alderman, and Carlson, based on Carlson's transfer of the $10,000, and the belief that Havilah and Carlson had bought various properties that VLK intended to purchase, including FABCO properties, based on previously developed business strategies for VLK. VLK claimed these actions amounted to, *inter alia*, conspiracy and tortious interference, denying VLK the corporate opportunity to first purchase the properties. In connection with the Maryland Lawsuit, VLK filed *lis pendens* on fifty-one Havilah properties located in the District of Columbia.

During the pendency of the Maryland lawsuit, Havilah filed the instant action against VLK in Superior Court, along with an emergency motion to cancel and release the *lis pendens* on its properties. The motions judge denied Havilah's motion to cancel and release the *lis pendens* and stayed the proceedings pending the outcome of the Maryland lawsuit. In February 2009, the jury in the Maryland lawsuit found in favor of Havilah and Alderman on all counts. However, the jury found that Carlson had breached his fiduciary duty to VLK. The *lis pendens* were released a few days later.

Havilah subsequently recommenced the instant action against VLK for malicious prosecution and tortious interference, claiming that the filing of *lis*

*pendens* on thirty-one Havilah-owned properties pursuant to the Maryland lawsuit was done in bad faith, motivated by Karen's romantic feelings for Carlson and jealousy over his romantic relationship with Alderman, and that these filings caused the properties to lose value, deterred potential buyers, and placed the properties at risk of foreclosure. The thirty-one *lis pendens* at issue concern properties (1) outside the Restricted Area limitation placed on Carlson, (2) inside the Restricted Area but acquired after VLK had agreed to release Carlson from the restraint, or (3) never identified by VLK as properties of interest.

VLK filed motions for summary judgment. As to malicious prosecution, VLK argued that Havilah failed to support the necessary element of "special injury" for the claim to survive as a matter of law. As to tortious interference, VLK claimed that the notices of *lis pendens* were absolutely privileged. VLK also argued that Havilah failed to mitigate its damages by rejecting VLK's offer to release the *lis pendens* if Havilah agreed to enter into an escrow agreement with it for proceeds from the sale of any property pending final resolution of the Maryland lawsuit.

In two detailed written orders, the trial court granted VLK's motion for summary judgment as to malicious prosecution, but denied its motions as to

tortious interference. The trial court determined that Havilah failed to demonstrate that the filing of thirty-one *lis pendens* constituted a "special injury" to survive summary judgment on the malicious prosecution count. First, the court found that *lis pendens* are intrinsic to lawsuits over real property interests and, thus, cannot be a "special injury" as this court has previously defined the term. *See Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978) (defining "special injury" as an injury "which would not necessarily result in suits to recover for like causes of action."). Second, the trial court determined that the damage suffered by the filing of *lis pendens*, namely, diminution of value and difficulty in selling the properties, seemed "indistinguishable from the 'loss of income' that [this court] has specifically excluded from its definition of special injury." Lastly, the trial court found that it did not matter whether one or thirty-one *lis pendens* were filed, because a finding of special injury is not predicated on the number of filings.

The trial court came to a different conclusion on tortious interference. Regarding the argument that *lis pendens* were "absolutely privileged," the trial court found that, although there was no case law directly on point in the District of Columbia, it appeared from our case law on related issues that we follow the "minority rule" that such filings are only conditionally privileged, meaning that a tortious interference claim can be maintained in limited instances where the

underlying litigation was filed in bad faith.[7]  Regarding whether Havilah mitigated damages, the trial court determined that Havilah's refusal to enter into a proposed escrow agreement with VLK in exchange for the release of *lis pendens* was not unreasonable as a matter of law, given that the escrow account gave some control of Havilah's properties to VLK by requiring VLK's approval of Havilah's land deals.  Further, the trial court concluded that, viewed in the light most favorable to Havilah as required by the summary judgment standard, Havilah undertook sufficient measures to mitigate damages by filing motions to cancel the *lis pendens* and at least engaging in negotiations over the proposed escrow account.

Consequently, Havilah's sole remaining claim of tortious interference went to trial.  At trial, Havilah introduced Karen as a hostile witness, and presented

---

[7]  The trial court looked to three primary cases.  Specifically, in *Casco Marina Dev., LLC v. District of Columbia*, 834 A.2d 77, 84 (D.C. 2003), this court cited the language from the Restatement (Second) of Torts in formulating the elements of tortious interference.  The Restatement, in turn, adopts the "minority rule" that such claims may be based on prior civil litigation instituted in bad faith.  *See* Restatement (Second) of Torts § 767 cmt. c. (1979).  In *Bowhead Information Technology Servs., LLC v. Catapult Technology, Ltd.*, 377 F. Supp. 2d 166, 176 (D.D.C. 2005), the federal court concluded that it believed District of Columbia courts follow the Restatement and would, therefore, hold that "colorable suits may give rise to a tortious interference claim in the limited circumstance where the defendant brought or threatened to bring suit with the sole intention to harass."  Lastly, in *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 549 (D.C. 2002), in dicta, this court appeared to note that a tortious interference action based on the filing of a *lis pendens* notice was permissible if timely filed.

testimony from Arthur Konopka, VLK's former attorney who helped it acquire distressed properties, to testify as an expert witness regarding the legal effects of *lis pendens* on real property. Gregory C. Syfax, a real estate appraiser, testified as an expert witness on behalf of Havilah regarding his calculations of lost value to Havilah's properties that were subject to *lis pendens*. Carlson testified and denied providing Alderman with real estate advice on the properties at issue or confidential information secured from VLK. Lavrne Robinson, Havilah's real estate agent on many of the properties at issue, acknowledged that there was "active interest in virtually all of the properties" — including nine properties with sales contracts — until the filing of *lis pendens*, and that he continued to try to sell the properties even after the *lis pendens* were filed to no avail. Robinson claimed that once he made potential buyers aware of the *lis pendens* on a property, the buyers lost interest in "moving forward until the *lis pendens* was removed." For example, in one instance, the property was scheduled for closing but did not go through after the *lis pendens* was filed. Jean-Marie Sylla, Havilah's primary attorney during the Maryland lawsuit, testified that he advised Havilah against entering into an escrow agreement with VLK.

Alderman corroborated much of Robinson's testimony, stating that she was successful in marketing her properties prior to the filings of *lis pendens*. In fact,

she claimed that by November 2007, she had sales contracts "on almost all" of her properties, and that the market was in a "frenzy" as people were buying properties at "an alarming rate." However, after the *lis pendens* were filed, those offers fell through and interest in the properties diminished. Alderman claimed that the filings caused the properties to be "tied up" and unsellable, even though she continued to market them. Lastly, over objection, Havilah proffered numerous exhibits into evidence for the limited purpose of demonstrating Havilah's business expectancies in the properties at issue and its efforts to mitigate damages after the *lis pendens* were filed. The trial court gave a limiting instruction prohibiting the jury from considering the facts contained within the documents for the truth of the matter asserted. These exhibits included, *inter alia*, emails between prospective buyers and realtors and Havilah, listing agreements, draft sales contracts, appraisals, internal notes, and draft settlement agreements. In its defense, VLK presented testimony from Oakleigh J. Thorne, another real estate appraiser, an expert witness who refuted Syfax's appraisal of the change in value of Havilah's properties, and Ronald Early, VLK's attorney during the Maryland lawsuit, regarding his good faith basis for filing that lawsuit.

At the end of the nearly two-week-long trial, the trial court gave the following jury instruction regarding a claim of tortious interference with

prospective advantage: "The law prohibits one from maliciously interfering with the business rights of another. *Business expectancies, which are commercially reasonable to anticipate are considered to be property*, and therefore, are protected from unjustified interference. These expectancies need only be probable and include future contracts and lost opportunities to obtain customers." (Emphasis added). With regard to the privilege defense, the trial court instructed the jury that:

> [I]f you find the plaintiff has established the elements of the claim of interference with [pro]spective business advantage by a preponderance of the evidence, the defendants may avoid liability by proving that the interference was legally justified or privileged.
>
> In this case[,] the conduct is legally justified and/or privileged if defendants can establish with respect to the 31 lots at issue in this matter that they believed that they had a good faith basis for asserting a [bona fide] claim.
>
> In other words, the defendants can demonstrate that their interference was justified and/or privileged by showing that they had a good faith belief that they had a legally protected interest that existed as of the time of the alleged interference, meaning that at the time the *lis pendens* were filed, and that their action[s] were taken to protect that interest.

Lastly, on the issue of damages calculation, the trial court instructed the jury that:

> The measure of damages for the wrongful filing of a *lis pendens* is the difference between the fair market value of the property at the time of the filing of the *lis pendens* and its fair market value at the time of its release.
>
> In arriving at a fair market value you may consider the expert testimony, the contracts that [Havilah] Real

Properties Services, LLC, [had] in place at or around the time of the *lis pendens* filing and any other evidence and/or testimony that you deem relevant and persuasive.

You may also award the plaintiff damages to compensate it for other expenses that you may [find] that it [incurred] as a result of the *lis pendens* filings.

After three days of jury deliberation, the jury rendered a verdict in favor of Havilah and awarded damages of $602,942. These appeals followed.

## II.    VLK's Appeal

VLK presents four arguments on appeal, two of which merit full discussion.[8]

Primarily, VLK argues that the trial court erred in denying summary judgment on

---

[8] We dispose of VLK's two other claims summarily. VLK argues that the trial court erred in admitting Havilah's exhibits into evidence because these documents constituted hearsay and were prejudicial. VLK also claims that the trial court plainly erred in failing to examine each exhibit individually prior to admission. Based on the record, we are satisfied with the trial court's reasoning in admitting the documents into evidence, i.e., for the purposes of proving Havilah's business expectancies and demonstrating that Havilah tried to mitigate its damages, rather than for the truth of the matter asserted, and that, consequently, the documents did not constitute inadmissible hearsay. *See Puma v. Sullivan*, 746 A.2d 871, 875-76 (D.C. 2000). Further, any potential prejudice was mitigated by the trial court's jury instruction on how these exhibits were to be analyzed. *See Sherrod v. United States*, 478 A.2d 644, 659 (D.C. 1984) ("The jury is presumed, unless the contrary appears, to follow the [trial judge's] instructions."). Lastly, VLK lacks support for its argument that the trial court was required to, *sua sponte*, review each exhibit for potential evidentiary issues prior to its admission.

(continued . . .)

the tortious interference claim because the filings of *lis pendens* in connection with the Maryland lawsuit were absolutely privileged. VLK also argues that, even if the *lis pendens* were not absolutely privileged, Havilah presented no evidence that VLK interfered with any specific business relationship, and that the method for calculating damages was speculative.

### A. *Privilege of* Lis Pendens *Filings as a Defense to a Claim of Tortious Interference with Contract and/or Prospective Advantage*

We review the trial court's grant of summary judgment *de novo*. *See Woodland v. District Council 20*, 777 A.2d 795, 798 (D.C. 2001). "In reviewing a

---

(. . . continued)
Accordingly, there was no error, much less plain error, on the part of the trial court in not doing so.

VLK also claims that Havilah's refusal to enter into an escrow agreement with VLK constituted a failure to mitigate damages as a matter of law. This argument again lacks merit. *See generally Trs. of Univ. of Dist. of Columbia v. Vossoughi*, 963 A.2d 1162, 1178 (D.C. 2009) ("[T]he duty to mitigate damages, bars recovery for losses suffered by a non-breaching party . . . that could have been avoided by reasonable effort and without risk of substantial loss or injury.") (citations and internal quotation marks omitted). Generally "[w]hat is a reasonable effort [to mitigate damages] is a question of fact," *Howard Univ. v. Lacy*, 828 A.2d 733, 739 n.8 (D.C. 2003) (citations and internal quotation marks omitted), and thus for the jury to decide. In any event, we cannot say that Havilah's actions in filing the motion to cancel the *lis pendens*, continuing to market the properties after the filings, and engaging in negotiations with VLK were unreasonable as a matter of law. *See Nader v. de Toledano*, 408 A.2d 31, 42 (D.C. 1979).

trial court order granting summary judgment, we conduct an independent review of the record, and [the] standard of review is the same as the trial court's standard in considering the motion for summary judgment." *Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279, 1281 (D.C. 2002). Summary judgment is granted if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* The party opposing the motion must at a minimum present enough evidence to make out a *prima facie* case in support of its claim. *Id.* at 1281-82.

The District of Columbia has not conclusively resolved the question of whether the filing of a notice of *lis pendens* ancillary to litigation over real property interests is protected by an absolute or a conditional privilege against a claim of tortious interference with contract and/or prospective advantage; thus, in deciding this issue, our review is *de novo*. *See In re Greenspan*, 910 A.2d 324, 335 (D.C. 2006). Appellate courts across the country, as well as our trial court, are divided. *Compare Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1117-18 (Col. 1990) (en banc) (adopting the minority rule that *lis pendens* are conditionally privileged), *with Albertson v. Raboff*, 295 P.2d 405, 409 (Cal. 1956) (adopting the majority rule that *lis pendens* are absolutely privileged). *See Georgetown Park Assocs. II, Ltd. P'ship v. Eastbanc, Inc.*, No. 06-CV-8154, Order

Granting Defendants' Partial Mot. Dismiss (D.C. Super. Ct. Jul. 30, 2007) (concluding that absolute privilege, rather than conditional privilege, applied to the filing of *lis pendens*).

The majority of jurisdictions have concluded that the filing of *lis pendens* is protected by an absolute privilege, so that any subsequent lawsuit for tortious interference based on such filings is barred as a matter of law, even if the lawsuit underlying the *lis pendens* filings was asserted in bad faith or with malice.[9] "Consequently, neither [the plaintiff's] motive nor evidence tending to show motive is relevant" in jurisdictions that adopt the absolute privilege rule; rather, the "only relevant inquiry is whether the *lis pendens* notices bore a *reasonable relation* to the action filed." *Birdsong v. Bydalek*, 953 S.W.2d 103, 114 (Mo. Ct. App. 1997) (emphasis added). On the other hand, a few states have concluded that the filing of *lis pendens* is only conditionally or "qualifiedly" privileged, meaning that an action for tortious interference arising from such filings are generally barred,

---

[9] *See, e.g.*, *Manders v. Manders*, 897 F. Supp. 972, 978 (S.D. Tex. 1995); *Zamarello v. Yale*, 514 P.2d 228, 230 (Alaska 1973); *Woodcourt II, Ltd v. McDonald Co.*, 173 Cal. Rptr. 836, 839 (Cal. Ct. App. 1981); *Procacci v. Zacco*, 402 So.2d 425, 427 (Fla. Dist. Ct. App. 1981); *Ringier Am., Inc. v. Enviro-Technics, Ltd.*, 673 N.E.2d 444, 447 (Ill. App. Ct. 1996); *Powell v. Stevens*, 866 N.E.2d 918, 921 (Mass. App. Ct. 2007); *Birdsong, supra*, 953 S.W.2d at 13-14; *Lone v. Brown*, 489 A.2d 1192, 1197 (N.J. Super. App. Div. 1985); *Superior Constr., Inc. v. Linnerooth*, 712 P.2d 1378, 1381-82 (N.M. 1986).

but can be maintained if the underlying litigation was brought in bad faith or with malice.[10]

VLK makes three arguments in support of its contention that we should adopt the "absolute privilege" rule: (1) a majority of states have adopted the absolute privilege rule; (2) public policy supports the adoption of an absolute privilege rule because publications made during the course of a judicial proceeding already enjoy an absolute privilege from later claims of defamation; and (3) the absolute privilege rule is in conformance with this jurisdiction's *lis pendens* statute because it already provides remedies for filings made in bad faith.

We disagree and conclude that our adoption of the Restatement's formulation of the claim of tortious interference compels us to hold that the filing of a notice of *lis pendens* is only protected by a conditional privilege in the District of Columbia. If the litigation underlying the *lis pendens* filing was pursued in good faith, then both it and any notice of *lis pendens* filed in connection with that action are privileged and thus cannot form the basis for any valid claim of tortious

---

[10] *See, e.g.*, *Warren v. Bank of Marion*, 618 F. Supp. 317, 325 (W.D. Va. 1985); *Westfield Dev. Co.*, *supra*, 786 P.2d at 1117-18; *Belliveau Bldg. Corp. v. O'Coin*, 763 A.2d 622, 630 (R.I. 2000); *Kensington Develop. Corp. v. Israel*, 407 N.W.2d 269, 270 (Wis. Ct. App. 1987).

interference. If the underlying litigation is found not to have been pursued in good faith, then no privilege attaches to the underlying litigation, and a defendant can be liable for all damages proximately caused by that litigation, including damages occasioned by the filing of *lis pendens* related to that litigation. Our acceptance of the conditional privilege rule comports with other courts that have similarly adopted the Restatement. We also believe that it is the fairer rule because it provides an adequate remedy to parties that have suffered harm as a result of litigation over real property interests filed in bad faith.[11]

Elements of tortious interference with contract and/or prospective advantage are derived from the Restatement. To make out a prima facie case of tortious interference, the plaintiff must demonstrate: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting

---

[11] Further, we note that because *infra* Part III we hold that a party cannot maintain a claim for malicious prosecution based on the filing of *lis pendens* in a prior litigation, a party should have some avenue for relief in the District of Columbia for *lis pendens* filings made in connection with litigation pursued in bad faith. Given our precedent and adoption of the Restatement, we conclude that the better recourse in the District of Columbia for such an aggrieved party is via a claim of tortious interference. *Cf. Albertson, supra*, 295 P.2d at 410 (concluding that even though a *lis pendens* filing was absolutely privileged against a disparagement of title claim, damages flowing from the *lis pendens* may still be cognizable in the context of a claim of malicious prosecution).

damages." *Onyeoziri v. Spivok*, 44 A.3d 279, 286-87 (D.C. 2012) (citing Restatement (Second) of Torts § 766 (1979)); *see also Casco Marina Develop., LLC, supra* note 7, 834 A.2d at 84 ("The elements of tortious interference with prospective business advantage mirror those of interference with contract."). Unlike the common law, the Restatement formulates the claim "in terms of whether the interference [was] improper or not, *rather* than in terms of whether there was a specific privilege to act in the manner specified." *See* Restatement (Second) of Torts § 767 cmt. b (1979) (emphasis added). Thus, the "motive" behind the interference is the key consideration in determining whether recovery under the tort is available. *See Sorrells v. Garfinckel's, Brooks Brothers, Miller & Rhoads, Inc.*, 565 A.2d 285, 290 (D.C. 1989) (adopting Restatement § 767). In fact, Restatement (Second) of Torts § 773 (1979), explicitly recognizes as an affirmative defense only interfering conduct amounting to a "bona fide claim," i.e.,

> [o]ne who, by asserting *in good faith* a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another *does not interfere improperly* with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

(Emphasis added). Consequently, contrary to the majority rule, the Restatement necessarily recognizes only a "conditional privilege" to the filing of litigation and

acts taken ancillary to such litigation, such as *lis pendens* filings.  *See* Restatement § 767 cmt. c.

Consistent with our case law and the Restatement's construction of the legal justification and privilege defense, we hold that the recordation of *lis pendens* ancillary to litigation over real property interests is only protected by a conditional privilege against a claim of tortious interference with contract and/or prospective advantage in the District of Columbia.[12]  This means that a defendant may avoid liability if he or she can establish that the notice of *lis pendens* was filed pursuant to litigation that was initiated in good faith.  *See Sorrells, supra*, 565 A.2d at 290 (observing that under the Restatement § 766, claims of legal justification are "vitiated" if malice is proved); *see also NCRIC, Inc., supra*, 957 A.2d at 901; *Onyeoziri, supra*, 44 A.3d at 288; *Westfield Develop. Co., supra*, 786 P.2d at 1118 ("[T]he interferer may still escape liability by establishing, as an affirmative defense, that he or she was asserting a bona fide claim.").  Whether the underlying litigation was undertaken in good faith is a question of fact for the jury to decide. *See Oparaugo v. Watts*, 884 A.2d 63, 82 (D.C. 2005); *see also Onyeoziri, supra*, 44 A.3d at 290.

---

[12] It is also worth mentioning that, although dicta, this court has previously indicated that a tortious interference claim based on the filing of *lis pendens* in bad faith could be maintained.  *See Beard, supra* note 7, 790 A.2d at 549.

Our conclusion that *lis pendens* are only conditionally privileged in the District of Columbia is in conformance with other jurisdictions that have similarly adopted the Restatement. For example, like us, the Colorado Supreme Court concluded that a filing of *lis pendens* was only conditionally privileged based, in large part, on Colorado's adoption of the Restatement, stating that a privilege asserted as a defense to a claim of tortious interference must be made in good faith. *See Westfield Dev. Co., supra*, 786 P.2d at 1118 (citing Restatement § 733) ("[W]here the means of alleged interference is the filing of *lis pendens*, we believe that a litigant asserting a *bona fide claim* has a privilege to interfere.") (emphasis added). Similarly, the Rhode Island Supreme Court concluded that a *lis pendens* filing is only protected by a conditional privilege and may be overcome upon a showing of "actual malice." *See Belliveau Bldg. Corp., supra* note 10, 763 A.2d at 630 (citing Restatement § 773).[13] Conversely, jurisdictions that have not adopted the Restatement's formulation of the tort claim generally apply an absolute privilege rule to such filings. *See generally Manders, supra* note 9, 897 F. Supp. at

---

[13] *See also See Guerdon Ind., Inc. v. Rose*, 399 N.W.2d 186, 187-88 (Minn. Ct. App. 1987) (citing the Restatement in stating that a conditional privilege applied to the filing of a notice of *lis pendens*); *McReynolds v. Short*, 564 P.2d 389, 393 (Ariz. Ct. App. 1977) (same).

977 (concluding simply that "[t]he privilege of legal justification is an affirmative defense to a tortious interference claim.").[14]

VLK does point us to decisions from other jurisdictions explaining why, as a matter of policy, an absolute privilege should apply. In *Albertson*, a California case considered by many jurisdictions to be the "premier" decision on this issue, the court concluded that *lis pendens* were "clothed" with the same absolute privilege that blankets publications made during the course of judicial proceedings. 295 P.2d at 408.[15] *See generally Pond Place Partners*, *Inc. v. Poole*, 567 S.E.2d 881, 894 (S.C. Ct. App. 2002). The Massachusetts case *Powell* succinctly distilled *Albertson* and its progeny's reasoning for holding that an absolute privilege should apply to *lis pendens* filings, explaining that jurisdictions that have extended the

---

[14] In one possible outlier case, *Birdsong*, the court concluded that *lis pendens* were absolutely privileged but also seemed to adopt the Restatement's definition of tortious interference. 953 S.W.2d at 111, 115. However, it appears that the Missouri court did not also explicitly adopt Restatement § 733, which articulates the "bona fide claim" conditional defense.

[15] It is worth noting that, in California, *Albertson*'s broad holding in favor of an absolute privilege rule for *lis pendens* filings has been "somewhat limited or 'partially abrogated'" by statutory amendment. *La Jolla Grp. II v. Bruce*, 149 Cal. App. 4th 461, 473 (Cal. Ct. App. 2012). The amendment explicitly states that "[a] recorded *lis pendens* is *not* a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law." *Id.* (emphasis added) (quoting Cal. Civil Code § 47 (b)(4) (West 2005)).

absolute privilege rule have adopted or accepted one or more of the following rationales in doing so:

> (1) with few exceptions, any publication made in judicial proceedings enjoys an absolute privilege from subsequent claims of defamation; (2) the only purpose of recording a notice of *lis pendens* is to put prospective buyers on constructive notice of the pendency of the litigation; (3) the notice of *lis pendens* is purely incidental to the action in which it is filed, refers specifically to that action, and has no existence apart from that action; and (4) the recording of a notice of *lis pendens* is in effect a republication of the proceedings in the action and is, therefore, accorded the same absolute privilege as any other publication in that action.

*Powell, supra* note 9, 866 N.E.2d at 921. Admittedly, the logic for concluding that *lis pendens* filings are absolutely privileged is not unpersuasive.[16]

While we reject the "absolute privilege" analytical framework that is set forth in this line of cases, our ruling today — which makes the privilege status of a *lis pendens* filing dependent on the good faith basis of the underlying litigation — vindicates many of the same concerns that provide the rationale for those decisions. *Lis pendens* filings do serve a socially beneficial function in

---

[16] Some courts, however, may not necessarily view a *lis pendens* filing as a communication made in the course of judicial proceedings. *See Warren, supra* note 10, 618 F. Supp. at 325 ("such a notice can easily be viewed as an extrajudicial publication involving merely a private act, and not involving any function of the court, thus falling outside the scope of protection given to communications made in the course of judicial proceedings.").

safeguarding the rights of third parties. As a general rule, litigants should be incentivized to make such filings without fear of reprisal. However, for the reasons set forth above, we see no reason to extend such protection, as many of the "absolute privilege" jurisdictions appear to have done, to litigants who have initiated the underlying litigation in bad faith. In fact, this court has similarly concluded that publications made during the course of judicial proceedings are absolutely privileged from subsequent claims of defamation. *See Oparaugo, supra*, 884 A.2d at 79 ("Under this jurisdiction's rule, an attorney has an absolute privilege to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he [or she] participates as counsel, if it has some relation to the proceeding.") (brackets in original) (citations and internal quotation marks omitted). This recognition of an absolute privilege for judicial publications in the context of a defamation suit is based on the public policy of "securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients." *Id.* (quoting Restatement (Second) of Torts § 586 cmt. a).

Even though we have never considered the privilege in the context of a tortious interference claim, we recognize that there is some tension with our

decision here that litigation and the ancillary filings of *lis pendens* are only conditionally privileged, given our prior recognition of an absolute privilege for publications made during the course of judicial proceedings for defamation. The Restatement appears to acknowledge this tension as well, stating that "[u]nlike other intentional torts [i.e., defamation or slander of title], tortious interference with contract has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act." *Belliveau Bldg. Corp., supra* note 10, 763 A.2d at 628 (citing Restatement § 767). Recognizing and acknowledging what may appear to be some inconsistency, we believe a few key differences between the two claims warrant the difference in treatment.

First, the reasoning underlying an absolute privilege rule for judicial publications in a defamation suit is different from the concerns at issue in the tortious interference context. As previously stated, parties to litigation are granted an absolute privilege in defamation suits over the publication of any relevant statements made during the judicial proceedings because attorneys should have freedom in their efforts to secure "justice" for their clients. *See Oparaugo, supra*, 884 A.2d at 79. Our recognition of only a conditional privilege for claims of tortious interference does not go against this stated policy; instead, it seeks to prevent parties from utilizing the litigation process as a coercive weapon. *See*

Restatement § 767 cmt. b. Put another way, the absolute privilege rule is necessary in a defamation suit because attorneys should be free to publish statements during the course of judicial proceedings without fear of being later subject to suit, but upholding an absolute privilege for a tortious interference claim would go against the purpose of this claim, which, like the instant case, is to prevent bad faith litigants from abusing the judicial process solely for the purpose of interfering with another party's business prospects. *See, e.g.*, *Warren, supra* note 10, 618 F. Supp. at 325 ("The one holding title to the property . . . deserves the protection of a legal disincentive against an ill willed creditor who, without justification, wishes to apply undue pressure by [tying] up the record owner's property with a notice of *lis pendens* for what could be a period of years."). The conditional privilege rule strikes this balance; it protects litigants with bona fide real property interests from future lawsuits, while discouraging those who would use a notice of *lis pendens* as a coercive, bad faith tactic. *See id.*

Second, our jurisdiction embraces the Restatement's definition of tortious interference and its defenses, which makes clear that any assertion of privilege must be conditioned on a "bona fide claim" made in good faith. *See* Restatement § 773. In so doing, we implicitly agree that the public policy of encouraging free access to the courts, forming the basis of an absolute privilege, must give way, in

the context of a tortious interference claim, to the competing public policy concern of preventing bad faith litigants from abusing the judicial process. *See Westfield Dev. Co., supra*, 786 P.2d at 1117 (observing this same dichotomy). Many courts have recognized that there are simply differing views on this issue, and that it is in large part determined by how the claim has evolved in their respective jurisdictions. *See Birdsong, supra*, 953 S.W.2d at 114. Consequently, the fact that an absolute privilege applies to publications during judicial proceedings in the defamation context is not contrary to our decision today in the tortious interference context.

Finally, we reject VLK's assertion that the absolute privilege rule is in conformance with our *lis pendens* statute, based on the notion that the statute already provides adequate remedies for *lis pendens* filed in bad faith. Under our *lis pendens* statute, a party seeking to terminate such filings must bring an action in the Superior Court to cancel the notice. D.C. Code § 42-1207 (g) (2010 Supp.).[17] Pursuant to subsection (h), the trial court may then:

> issue an order canceling the notice of pendency of action prior to the entry of judgment in the underlying action or proceeding if the court finds any one of the following:

---

[17] We note that subsection (h) of the *lis pendens* statute was added in 2010, after the events of the Maryland lawsuit and the release of the thirty-one *lis pendens*. Lis Pendens Amendment Act, 2010 D.C. Sess. Law Serv. 18-180 (West).

\*\*\*

> (3) *The underlying action or proceeding has not been prosecuted in good faith*, with all reasonable diligence, and without unnecessary delay.

(Emphasis added). Further, under subsection (d), the trial court may impose sanctions for the filing. "In determining whether sanctions are appropriate . . . [the trial court] should assess whether the non-prevailing party's filing of *lis pendens* was for an improper purpose, or was unwarranted by existing law or a frivolous argument for the extension, modification, or reversal of existing law, or was without evidentiary support." *6921 Georgia Avenue, N.W., Ltd. P'ship v. Universal Cmty. Dev., LLC*, 954 A.2d 967, 973 (D.C. 2008). That said, "[a] trial court need not make a finding of bad faith in relation to a party's filing of *lis pendens* in order to exercise its discretion in imposing sanctions. " *Id.*

This statutorily authorized sanction, which the trial court has discretion to impose, is not analogous to a common-law claim of tortious interference for damages. It is a fundamental legal principle that "[c]ompensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations and internal quotation marks omitted), while sanctions are simply a "penalty or coercive measure that results from failure to

comply with a law, rule, or order." *Alabama v. North Carolina*, 560 U.S. 330, 340 (2010) (citing Black's Law Dictionary 1458 (9th ed. 2009)). Consequently, because a common law claim of tortious interference intends to restore what was lost, or otherwise "make the plaintiff whole," it cannot be said that sanctions offer comparable relief to "compensatory damages." *See generally Croley v. Republican Nat'l Comm.*, 759 A.2d 682, 689 (D.C. 2000) (citation omitted). Since sanctions and damages serve different purposes, it would be unfounded to hold that an absolute privilege rule is consistent with our *lis pendens* statute simply because the statute authorizes sanctions. Further, it is a "well-established maxim of statutory construction that statutory remedies are presumed to be cumulative to the common law, and do not abolish common law remedies unless so declared in express terms or by necessary implication." *Towers Tenant Asso'n, Inc. v. Towers Ltd. P'ship*, 563 F. Supp. 566, 575 (D.D.C. 1983). Nothing within the language of our *lis pendens* statute leads us to conclude that the statute intended to foreclose a claim of tortious interference in instances such as here.

Accordingly, the trial court did not err in denying VLK's motion for summary judgment on the claim of tortious interference on the basis that only a conditional privilege applied to the filing of a notice of *lis pendens* in connection to the Maryland lawsuit. Consequently, the question of whether VLK was entitled to

the privilege defense for the thirty-one notices of *lis pendens* depended on whether

VLK initiated the underlying Maryland lawsuit in good faith, which was a factual

question for the jury to decide at trial.[18] *See Oparaugo, supra*, 884 A.2d at 82.

## B. Evidence of Tortious Interference and Calculation of Damages

We next turn to VLK's alternative argument that Havilah failed to present

evidence at trial that it had specific business relationships that it lost as a result of

VLK's pursuit of the underlying litigation, or that VLK knew about a particular

relationship and intentionally interfered with it. Because this was a jury trial, we

---

[18] There is some ambiguity, on the record before us, as to whether the trial court directed the jury to assess the good faith basis of the underlying litigation, which, as we hold today, would be the proper inquiry, or whether the jury was improperly invited to assess the motivation of VLK in filing the individual *lis pendens*, which would not be actionable if the underlying litigation were found to be privileged. Much of the case appears to have gone forward on the notion that the relevant consideration was VLK's motivation in filing the individual *lis pendens*. *See, e.g.,* Second Amended Complaint at ¶ 51 ("[VLK] intentionally, and for an improper purpose, interfered with Havilah's business relationships, expectancies, and contracts by filing lis pendens on its properties, thereby inducing a termination of Havilah's contracts, business relationships, and expectancies thereof."). Ultimately, however, we are persuaded that the trial court's final jury instructions sufficiently focused the jury on evaluating the merits of the underlying litigation. ("In this case[,] the conduct is legally justified and/or privileged if defendants can establish with respect to the 31 lots at issue in this matter that they believed that they had a good faith basis for asserting a [bona fide] claim.") *See Knight v. Georgetown Univ.*, 725 A.2d 472, 483 (D.C. 1999) ("Jurors are presumed to follow their instructions . . . .").

construe VLK's claim as a challenge to the trial court's denial of its motion for judgment as a matter of law.[19] Within this substantive claim, we also consider VLK's argument that the trial court erred in instructing the jury to apply the fair market value method of calculating damages.

"A trial court may grant a motion for judgment as a matter of law only if no reasonable juror, viewing the evidence in the light most favorable to the prevailing party, could have reached the verdict in that party's favor." *NCRIC, Inc., supra*, 957 A.2d at 902 (citation and internal quotation marks omitted). VLK's argument that Havilah failed to identify specific business relationships can be disposed of by reference to our decision in *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978). In *Carr*, we stated that under the tort of interference with prospective advantage, "business expectancies, not grounded on present contractual relationships but *which are commercially reasonable to anticipate*, are considered to be property and therefore protected from unjustified interference." *Id.* at 84 (emphasis added) (interpreting William L. Prosser, *Torts* § 130 at 949 (4th ed. 1971)). We further observed that these expectancies are considered reasonable in cases where "there is a background of business experience on the basis of which it is possible to estimate with some

---

[19] VLK moved for judgment as a matter of law at the close of Havilah's case and again at the close of evidence. Both motions were denied.

fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered." *Id.* (citing Prosser, *supra*, at 950); *see, e.g.*, *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 60 (D.D.C. 2012) (concluding that, under District law, the term "commercially reasonable to anticipate," requires "a probability of future contractual or economic relationship and not a mere possibility").

Here, viewing the evidence in the light most favorable to Havilah, as we must on appeal, there was sufficient evidence for the jury to conclude that it was commercially reasonable for Havilah to anticipate selling its thirty-one properties at issue, sales which were thwarted by VLK's initiation of litigation and ancillary filing of *lis pendens*. For example, the voluminous amount of documentation that Havilah proffered into evidence showed that it actively marketed the properties, and that it had generated genuine interest in the properties prior to the filings of *lis pendens*. In addition, Alderman testified that Havilah purchased the properties in the first half of 2007, a time when people were buying "properties at an 'alarming rate,'" and that it was successful in marketing and selling at least some of the properties until the *lis pendens* were filed. Robinson, Havilah's real estate agent, corroborated Alderman's testimony, stating that he assisted Alderman in entering sales contracts for some of the properties at issue, but that deals fell through after

the *lis pendens* were filed.  As attested by Konopka, Havilah's expert witness on *lis pendens*, a *lis pendens* filing makes it practically impossible for a property to be sold because of the potential risks involved for buyers.  In fact, the marketability of Havilah's properties was recognized by VLK and its attorneys, as evidenced in emails showing that VLK initiated the Maryland lawsuit, at least in part, due to its concern that Havilah's properties were being sold too quickly and for too high a profit, and in VLK's complaint in the Maryland lawsuit, which claimed that Havilah had "sold at least *three* of [the properties] for a significant profit of several hundred thousand dollars."  (Emphasis in original).  From this, the jury could also infer that VLK knew of Havilah's expectancies, and that  the litigation and ancillary *lis pendens* were aimed at interfering with the sale of Havilah's properties.  *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 592 F. Supp. 2d 86, 98-99 (D.D.C. 2009) ("[A] plaintiff must show that an interferer knew of the business expectancy.  An interferer's knowledge of a plaintiff's relationship or expectancy may be shown by the interferer's conduct or spiteful or threatening words.") (citations omitted).  Accordingly, based on the evidence presented at trial, the jury could reasonably conclude that Havilah had realistic expectancies in the sale of the thirty-one properties, which were damaged by the initiation of the litigation and the resulting filing of *lis pendens*, and that VLK was conscious of Havilah's expectancies.

With respect to the issue of damages, VLK essentially argues that the diminished fair market value method of calculating Havilah's damages relied on by the trial court to instruct the jury was too uncertain and speculative because it was premised on the "unfounded" assumption that Havilah could have sold all of its properties during the intervening time that the *lis pendens* were in place. We disagree. "Damages may not be based on mere speculation or guesswork. The evidence offered must form an adequate basis for a reasoned judgment." *Vector Realty Grp., Inc. v. 711 Fourteenth St., Inc.*, 659 A.2d 230, 234 (D.C. 1994) (citations and internal quotation marks omitted). However, damages need not be calculated with "mathematical precision" so long as they are based on a reasonable estimate of relevant data. *See NCRIC, Inc., supra*, 957 A.2d at 902-03.

In this case, the trial court relied on *Askari v. R&R Land Co.*, 225 Cal. Rptr. 285, 291 (Cal. Ct. App. 1986) and *Haisfield v. ACP Fla. Holdings, Inc.*, 629 So. 2d 963, 966 (Fla. 1993), which adopted *Askari*. In *Askari*, the court held that a party who wrongfully files *lis pendens* on another's property is liable for the consequential damages of the diminished value of the property, based on the principle that "if [a] vendee has interfered with the vendor's *freedom* . . . by retaining possession or asserting an interest in the property, the vendor may include any additional damages caused thereby in the amount necessary to give him the

benefit of his bargain." 225 Cal. Rptr. at 292 (emphasis added). Accordingly, Havilah's entitlement to the diminished fair market value of its properties is not premised on the "unfounded" assumption that it would have sold all thirty-one properties, but rather, such damages are to compensate Havilah for its loss of freedom in utilizing its properties during the period of time when the *lis pendens* were active. Havilah is permitted to recover these damages so long as it can prove that the *lis pendens* hindered its ability to sell the properties, and that it nonetheless diligently attempted to sell the property, both of which are adequately reflected in the record. *Id.* at 291. We do not believe this method for calculating damages is unduly speculative, especially given that both *Askari* and *Haisfield*, along with the District of Columbia in the breach of contract for real property context, have adopted this method of calculation. *See Quick v. Pointer*, 88 U.S. App. D.C. 47, 47, 186 F.2d 355, 355 (1950) ("The established rule in this jurisdiction is that damages under these circumstances [i.e., breach of contract for real estate] are the difference between the contract price and the fair market value of the property.") (footnote omitted).

We also note that diminished fair market value damages are consistent with the Restatement (Second) of Torts § 774A, which deals with damages in the context of a tortious interference claim. The Restatement states:

(1) One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for

> (a) the pecuniary loss of the benefits of the contract or the prospective relation;
>
> (b) *consequential losses for which the interference is a legal cause*; and
>
> (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.

(2) In an action for interference with a contract by inducing or causing a third person to break the contract with the other, the fact that the third person is liable for the breach does not affect the amount of damages awardable against the actor; but any damages in fact paid by the third person will reduce the damages actually recoverable on the judgment.

(Emphasis added). Accordingly, under the Restatement, a party is specifically entitled to any consequential damages, which, in the context of *lis pendens* filings made in connection with bad faith litigation, include the diminishment in fair market value. *Askari, supra*, 225 Cal. Rptr. at 291; Restatement § 774A cmt. d ("The plaintiff can also recover for consequential harms, provided they were legally caused by the defendant's interference."). Although it appears that we have not previously adopted this particular Restatement section, given our prior acceptance of the Restatement as it pertains generally to claims of tortious

interference, we think it only logical to also adopt the Restatement's method of calculating damages for claims of tortious interference going forward.[20]

We recognize that, based on the specific facts of this case, the fair market value method of calculating damages may appear overly generous to Havilah, given that the value of property generally fell across the country between 2007 and 2009 due to the subprime mortgage crisis. However, as the *Askari* court explained:

> This rule is not intended to penalize a buyer who files a *lis pendens*. Changing conditions in the real estate market may work to the buyer's benefit or to his disadvantage. For example, if the property has increased in value when the *lis pendens* is lifted, the damages the buyer must pay are accordingly reduced. In some cases the buyer may pay no damages. The buyer's damages are subject to change because the filing of a *lis pendens* does not place valuation of the property in a state of suspended animation.

225 Cal. Rptr. at 292. Based on the foregoing, we conclude the diminished fair market value method was not an improper method for calculating damages stemming from *lis pendens* filings made in connection with bad faith litigation. Accordingly, the trial court did not err in instructing the jury to apply the fair market method in calculating Havilah's damages.

---

[20] Colorado, which has accepted the conditional privilege rule based on its adoption of the Restatement, has cited with approval this particular Restatement provision. *See Westfield Develop. Co., supra*, 786 P.2d at 1120.

### III.  Havilah's Appeal

Havilah's sole argument on appeal is that the trial court erred in granting summary judgment in favor of VLK on the malicious prosecution count because the filing of a *lis pendens*, or alternatively the filing of thirty-one *lis pendens*, satisfies the "special injury" element for a claim of malicious prosecution as a matter of law.  Principally, Havilah argues that the Restatement (Second) of Torts recognizes that the filing of *lis pendens* without probable cause satisfies the "special injury" requirement.  Havilah further claims that many other jurisdictions recognize that a lawsuit for malicious prosecution can be brought based on the filing of *lis pendens* in bad faith.

Under the District of Columbia's formulation of the malicious prosecution cause of action, Havilah must present evidence that:  (1) the underlying suit terminated in its favor; (2) there was malice on the part of VLK in filing the underlying suit; (3) there was a lack of probable cause for the underlying suit; and (4) that it suffered a *special injury* as a result of the suit.  *See Joeckel*, 793 A.2d at 1282.  "Special injury" is defined as an arrest, a seizure of property, or an injury *"which would not necessarily result from suits to recover for like causes of action."*  *Id.* (emphasis added) (citations and internal quotation marks omitted).  The last

definition of "special injury" is at issue here.[21] We have repeatedly held that, in the District of Columbia, "injuries to reputation, emotional distress, loss of income, and substantial expense in defending" are outside the scope of what constitutes a "special injury." *Id.* (citing *Mazanderan v. McGranery*, 490 A.2d 180, 182 (D.C. 1984), *Epps v. Vogel*, 452 A.2d 320, 324 (D.C. 1982), and *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980)) (internal quotation marks omitted). We have narrowly defined "special injury" as part of this court's long-standing policy to "maintain . . . free access to the courts by persons with grievances who might otherwise be restrained from seeking redress because of their fear of liability should they fail . . . ." *Ammerman, supra*, 384 A.2d at 641. The fear is that "[o]therwise litigation would lead, not to an end of disputing, but to its beginning, and rights violated would go unredressed for fear of the danger of asserting them." *Melvin v. Pence*, 76 U.S. App. D.C. 154, 157, 130 F.2d 423, 426 (1942).

Recognizing, however, that "some sort of balance ha[s] to be struck between the social interest in preventing unconscionable suits and in permitting honest

---

[21] We disagree with Havilah's attempt to analogize a *lis pendens* filing with an injunction or a seizure of property because a *lis pendens* does not in and of itself restrict property interests. Instead, it is more appropriately characterized as simply notice to third parties of pending litigation regarding the property. *See Heck, supra* note 1, 941 A.2d at 1030 n.1 ("[L]*is pendens* is still only a notice; unlike a lien, a person obtains no new property interest through the operation of the *lis pendens* doctrine." (citations and internal quotation marks omitted)).

assertion[s] of supposed rights[,]" *Joeckel, supra*, 793 A.2d at 1282 (quoting *Soffos v. Eaton*, 80 U.S. App. D.C. 306, 307, 152 F.2d 682, 683 (1945)), in certain *rare* instances, we have allowed malicious prosecution suits on the basis that a party has sustained an economic injury *beyond* what is normally incidental to like causes of action. *Joeckel, supra*, 793 A.2d at 1283.

For example, in *Soffos*, the court concluded that Soffos' suit for malicious prosecution should not have been dismissed because the burden of being compelled to defend against "successive unconscionable suits [for possession of real property] is not [an injury] which would necessarily result in all suits prosecuted to recover for like causes of action." 80 U.S. App. D.C. at 307, 152 F.2d at 683 (internal quotation marks omitted). The court reasoned that, contrary to our general stated policy of open courts, "[n]o one is likely to be deterred from litigating an honest claim by fear that some future jury may erroneously decide that he has brought two suits maliciously and without probable cause." *Id.* (footnote omitted). Consequently, the court determined that in rare instances where one party *consecutively* sues another with malice (meaning at least twice), there is "no good reason why the law should tolerate repeated abuse of its processes." *Id.*

Likewise, in *Davis v. Boyle Bros., Inc.*, 73 A.2d 517, 520 (D.C. 1950), the court concluded that Davis articulated an actionable malicious prosecution claim because, although there was only one suit filed, the underlying action against Davis constituted "what might be termed one suit plus[,]" meaning "[i]t involves something *more* than the usual suit brought maliciously and without probable cause." *Id.* (emphasis added). Specifically, in *Davis*, defendant Boyle Bros. explicitly admitted to Davis that it sued the wrong person for failing to pay for merchandise purchased at its store, and promised her that the suit would be dismissed. *Id.* at 519-20. However, after having admitted its error, Boyle Bros., nonetheless, maintained suit against Davis and received a default judgment against her, and even attempted to have a trial on the merits after the default judgment was set aside. *Id.* The appeals court concluded that, under these unique "one suit plus" circumstances, this default "judgment is not an incident of an ordinary suit involved in this kind of claim." *Id.* at 520.

In contrast, any economic injuries stemming from a simple filing of *lis pendens* cannot accurately be described as an injury *beyond* what is normally incidental to like causes of action that meets our narrow definition of "special injury." This is because *lis pendens* are routinely filed in lawsuits involving real property interests; its primary purpose is to give third parties' constructive notice

of pending litigation. *See 1st Atl. Guar. Corp. v. Tillerson*, 916 A.2d 153, 157 (D.C. 2007). *See, e.g.*, *Kerns v. Kerns*, 53 P.3d 1157, 1162 (Colo. 2002) (stating that the filing of *lis pendens* promotes "the finality of litigation and economy of judicial resources" (citation omitted)). Moreover, a failure to file a notice of *lis pendens* in this jurisdiction actually *prevents* a plaintiff from later invoking its protections; namely, that a third party acquiring an interest in the property takes his or her interest subject to the parties' rights as finally determined by the litigation. *See 1st Atl. Guar. Corp., supra*, 916 A.2d at 157 ("Most jurisdictions, including the District of Columbia, have enacted statutes requiring a party to record a notice that litigation affecting property is pending in order to obtain the benefits of *lis pendens*."); *see also Trustee 1245 13th Street, NW No. 608 Trust v. Anderson*, 905 A.2d 181, 185 (D.C. 2006) ("[T]he appellee has valid title to the property by equitable conversion, undisturbed by the foreclosure action since *lis pendens* was not invoked . . . ." (footnote omitted)).

In addition, the relevant statute also broadly authorizes the filing of *lis pendens* for essentially *any* action or proceeding "in either state or federal court in the District of Columbia, or in any other state, federal, or territorial court, affecting the title to or tenancy interest in, or asserting a mortgage, lien, security interest, or other ownership interest in real property." D.C. Code § 42-1207 (a) (emphasis

added).  In fact, we have interpreted the phrase "other ownership interest in real property" to encompass even claims of *equity*.  *See Heck, supra* note 1, 941 A.2d at 1029-30; *see, e.g.*, 18A Am. Jur. 2d *Corporations* § 666 (2013) (concluding that in a usurpation of corporate opportunity case, "the corporation may seek an *equitable forfeiture*, requiring the shareholder to return any ill-gotten gains") (emphasis added).

Consequently, unlike the extraordinary facts in *Soffos* and *Davis*, the *lis pendens* filed pursuant to the Maryland lawsuit, which involved real property interests, cannot be considered an injury that would "not necessarily result from suits to recover for like causes of action."  For the same reason, any monetary losses suffered by Havilah stemming from VLK's filing of *lis pendens* are merely incidental economic losses.  *See Joeckel, supra*, 793 A.2d at 1283.

We have recognized that our adoption of a narrow "special injury" requirement for malicious prosecution claims is the minority position.  In fact, we have admitted that while we are "aware that the majority of the states have now rejected a special injury requirement, [we have] nonetheless opted to affirm our requirement of the same, in the belief that it best promotes this jurisdiction's policy of encouraging free access to the courts."  *Morowitz, supra*, 423 A.2d at 198.  The

Restatement (Second) of Torts § 677 (1979), which Havilah argues that we should embrace, follows the majority view and adopts a much broader interpretation of "injury." Specifically, that Restatement section, which encompasses the tort of malicious prosecution, explicitly states that bad actors are liable for "any material harm that is caused to the person who is deprived of the possession of his land or other things *by his inability to use them for any legitimate purpose*." § 677 (Emphasis added). Thus, under the Restatement's formulation, Havilah would not likely be barred from pursuing a malicious prosecution claim against VLK, given that the filings of *lis pendens* did, in some way, deprive Havilah from *fully* utilizing its properties for a legitimate purpose.[22]

However, Havilah is not the first party to ask this court to modify, broaden, or abandon our "special injury" requirement. We have long "declined prior invitations to abandon or modify the special injury rule based on the court's long-held belief 'that it best promotes this jurisdiction's policy of encouraging free access to the courts.'" *Joeckel, supra*, 793 A.2d at 1284.

---

[22] In addition to the Restatement, Havilah points us to cases from Maryland and other jurisdictions — including Rhode Island, New Jersey, North Carolina, and New York — that appear to state in some fashion that a *lis pendens* filing may satisfy the injury component for a malicious prosecution claim.

Havilah's alternative argument, that even if one *lis pendens* was insufficient to constitute a special injury, the filing of *thirty-one lis pendens* together is so excessive that such a large number of filings should be deemed a special injury, is similarly unpersuasive.  This case fails to satisfy either narrow exception to the special injury rule that this jurisdiction has previously recognized.  It neither presents the "two or more" malicious lawsuits scenario envisioned in *Soffos*, nor the "one suit plus" case articulated in *Davis*.  Although the *Soffos* court concluded that the "burden of being compelled to defend successive unconscionable suits" constituted an injury beyond what was normally incidental to like causes of action, this court has never held that, without more, the burden of having to defend oneself against a singular suit, even if unconscionable, qualified as a special injury.  80 U.S. App. D.C. at 307, 152 F.2d at 683.

As *Davis* makes clear, a malicious prosecution claim involving only one unconscionable suit, i.e., the "one suit plus" scenario, must involve "something more than the usual suit brought maliciously and without probable cause which ordinarily is commenced[.]"  73 A.2d at 520.  Here, given the context of the Maryland lawsuit, which by its nature involved numerous properties in dispute, we do not believe that any of the injuries alleged, i.e., incidental economic losses stemming from multiple *lis pendens* filings, would be unique from similar disputes

involving *multiple properties*. Therefore, the number of *lis pendens* filed pursuant to this one lawsuit is not dispositive in determining special injury. To hold otherwise would be contrary to our narrow construction of "special injury," and to our policy of maintaining an open court system, since malicious prosecution claims arguably could then be brought based simply on the number of causes of action alleged in a single lawsuit. *See Ammerman, supra*, 384 A.2d at 641.

Lastly, we also find such an argument arbitrary. As the trial court stated, "one could not logically argue that [twenty-five] *lis pendens* notices could not produce a special injury if [thirty-one] could, or that the injury caused by [fifteen] notices would be less 'special' in any logical way tha[n] stemming from [twenty-five], and so on down the slippery slope." For all of these reasons, the trial court did not err in granting summary judgment on the claim of malicious prosecution.

## IV. Conclusion

We affirm the trial court's various decisions in this complex civil action. On the issue of first impression, we hold that, in the District of Columbia, the filing of a notice of *lis pendens* is protected by a conditional privilege as a defense to a claim of tortious interference. Thus, such filings can only be the basis for suit in

limited instances where it can be shown that the underlying litigation was for an improper purpose. Accordingly, the trial court did not err in denying summary judgment on the claim of tortious interference.

Further, in determining damages for a tortious interference claim stemming from the wrongful filings of *lis pendens*, we conclude that the fair market value method is not speculative and is consistent with the Restatement's approach for damage calculations, which we adopt going forward.

Lastly, we likewise conclude that the trial court did not err in granting summary judgment in favor of VLK on Havilah's claim of malicious prosecution because the filing of a notice of *lis pendens*, or alternatively thirty-one *lis pendens*, did not constitute a "special injury" as a matter of law.

*Affirmed.*