UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITALKEYS, LLC<br>          Plaintiff,<br><br>v.<br><br>DEMOCRATIC REPUBLIC OF<br>CONGO, *et al.*,<br>          Defendants. | Case No. 15-02079 (KBJ-AK) |

REPORT AND RECOMMENDATION

Plaintiff CapitalKeys, LLC ("Plaintiff" or "CapitalKeys") seeks entry of Default

Judgment against the Democratic Republic of Congo ("Congo") and the Central Bank of the

Democratic Republic of the Congo ("Central Bank") (collectively, "Defendants") in Plaintiff's

Motion for Entry of Default Judgment Against All Defendants and Memorandum of Law in

Support thereof [24] (collectively, "Motion").  United States District Judge Ketanji B. Jackson

referred the Motion to the undersigned for a Report and Recommendation. (*See* June 14, 2016

Minute Order.)   On September 16, 2016, the undersigned held an evidentiary hearing

("Hearing") on the matter.  Upon consideration of the record, the pleadings, the testimony given

at the hearing, and for the reasons set forth below, the undersigned recommends that the Court

issue a Default Judgment in favor of Plaintiff against the defaulting Defendants and award

damages in part.

## I.     BACKGROUND

### A.     Contract Dispute

This case arises out of a contract dispute.  Plaintiff is a public affairs firm based in

Washington, D.C. (Plaintiff's Amended Complaint "Compl." [11] ¶ 5; Declaration of Adam

Falkoff "Falkoff Decl." Ex. A [24-30] at 2.)[1]  Defendants, the Congo[2] and the Central Bank, spent six months negotiating with Plaintiff before entering into a verbal agreement in or around February 2013 to retain Plaintiff's government relations and strategic communication services. (*See* Compl. ¶¶ 12, 16; Falkoff Decl. [24-29] ¶ 2.)

In March 2013, the Congo made "a good faith payment of $600,000 as consideration for the Retainer Agreement." (Falkoff Decl. ¶ 3, Falkoff Decl. Ex. B [24-31] at 2.)  The following month, authorized representatives of the Central Bank traveled to Plaintiff's office in Washington, D.C. to formally execute the parties' agreement. (*See* Compl. ¶ 14; Falkoff Decl. ¶ 4.)  Specifically, Plaintiff and Defendants agreed to a five-year term during which Plaintiff would provide its services to the Congo and the Central Bank in exchange for a one-time payment of $16,002,000, due upon signing the Retainer Agreement. (*See* Falkoff Decl. ¶¶ 6–7, Ex. A at 5.)  This amount, plus the $600,000 that Defendants already paid, equaled the entire sum that Defendants agreed to pay Plaintiff for its services. (Falkoff Decl. Ex. A at 5; Falkoff Decl. Ex. B at 2.)

Acting as an agent for the Congo, the Governor of the Central Bank, Mr. Jean-Claude Masangu Mulongo, signed the written agreement after he received authorization from the President of the Congo. (*See* Compl. ¶ 17; Falkoff Decl. ¶¶ 2, 8; Falkoff Decl. Ex. A at 7.)  The Congo was therefore bound by the Retainer Agreement as well, and both Defendants were aware of this fact. (Compl. ¶¶ 12, 17; Falkoff Decl. ¶¶ 2, 4–5, 8; Mot. 11.)  Additionally, the parties

---

[1] For purposes of this Report and Recommendation, the page numbers cited are the ECF page numbers found on the top right corner of each page of the Motion, Declaration of Adam Falkoff, Declaration of W. Todd Miller, and exhibits.

[2] Throughout this Report and Recommendation, any mention of the Congo is in reference to the Democratic Republic of the Congo, not the Republic of the Congo—both of which are countries in Africa.

understood that the Congo would direct and control Plaintiff's obligations under their agreement. (Falkoff Decl. ¶ 4.)

Upon signing the contract, Defendants did not make the agreed-upon payment during their visit to Washington, D.C. (Mot. 12; Falkoff Decl. ¶ 9.)  Instead, they promised that "payment would be made shortly." (Compl. ¶ 18; Mot. 12; Falkoff Decl. ¶ 9.)  Due to Defendants' promise of payment, Plaintiff began providing its services and also assisting Defendants with "extra things . . . not in the contract," such as recommending talking points to the Governor of the Central Bank in order for the Government of the Congo to ultimately secure a $225,000,000 disbursement from the International Monetary Fund. (Hearing Transcript "Hearing Tr." [26] 39:16–23, 40:1–17 (Sept. 16, 2016); *see* Compl. ¶¶ 19–22; Falkoff Decl. ¶¶ 10–13.)

From June through August 2013, Defendants made weekly promises that payment was imminent, but to no avail. (*See* Compl. ¶ 23; Falkoff Decl. ¶ 14.)  During this time, Defendants also sent a delegation to Plaintiff's office in Washington, D.C. and provided additional assurances that, upon the delegation's return to the Congo, Plaintiff would receive the full payment of $16,002,000. (*See* Compl. ¶ 25; Falkoff Decl. ¶ 16.)  Defendants again failed to pay and, instead, continued to assure Plaintiff that payment was forthcoming. (*See* Compl. ¶¶ 25–26; Falkoff Decl. ¶¶ 16–17.)

Nevertheless, Plaintiff spent the following year providing its services to Defendants. (*See* Falkoff Decl. ¶¶ 18–20; Mot. 12.) These services included "elevating the global image of the Congo and assisting the Central Bank in modernizing their internal infrastructure." (Compl. ¶ 27; *see* Falkoff Decl. ¶ 18.)  Despite having not received a single payment since the parties executed the contract, Plaintiff continued performing its obligations under the agreement because

Defendants repeatedly promised to make payment and "because [Plaintiff] could not withdraw from these projects without consequence given the nature of Plaintiff's work." (Mot. 12; *see* Falkoff Decl. ¶ 34.)

On or around April 2014, about a full year after payment became due, Plaintiff received a letter, dated December 2013, from the President of the Congo. (*See* Falkoff Decl. ¶ 22; Mot. 13.) In the letter, the President of the Congo thanked Plaintiff for its services and stated that, upon receipt and confirmation of the letter, the Congo would send another delegation to Washington, D.C. to make the full payment. (*Id.*)  Plaintiff promptly contacted the Congo and confirmed receipt of the letter, but Plaintiff did not receive any payment. (*See* Compl. ¶ 32; Falkoff Decl., Ex. C. [24-32] at 2; Mot. 13.)

The Congo subsequently promised full payment after receiving a "positive progress report" from another visiting delegation. (Falkoff Decl. ¶¶ 24–25.)  During the Washington, D.C. visit, the delegates prepared a report "stating that operations were successful and thriving." (Falkoff Decl. ¶ 26.)  The President of the Congo instructed the head delegate to return to the Congo at the end of the week with the progress report. (Compl. ¶ 36; Falkoff Decl. ¶ 27; Mot. 13.)  Instead, the delegate spent an additional week in the United States visiting his daughter, which allegedly insulted the President of the Congo. (*See* Compl. ¶¶ 36–37; Falkoff Decl. ¶ 27; Mot. 13.)  As a result, the President of the Congo refused to review the delegation's report or make payment. (*See* Compl. ¶ 37; Falkoff Decl. ¶ 28; Mot. 13.)

Throughout 2014 and 2015, Defendants often promised they would pay the full amount owed to Plaintiff under the Retainer Agreement, but they continued to fail in making their payment. (*See* Falkoff Decl. ¶¶ 29–32; Mot. 13.)  Still, Plaintiff continued providing services to the Congo and the Central Bank with plans to "finish all pending projects as agreed upon."

(Compl. ¶ 39; Falkoff Decl. ¶ 34.)  In doing so, Plaintiff depleted its own resources to cover "substantial" costs, including salary, communication, and transportation expenses. (Compl. ¶ 40; Falkoff Decl. ¶¶ 35–37.)

Moreover, Plaintiff asserts that its efforts to recover payment from Defendants precluded it from accepting three additional contracts worth an estimated total of $5,016,000. (Mot. 24; Falkoff Decl. ¶ 49.)  In June and September of 2014, Plaintiff pre-negotiated two contracts for its services, totaling $4,260,000. (*See* Falkoff Decl. ¶¶ 40–41.)  The first contract was worth $2,640,000, and the second contract was worth $1,620,000. (*Id*.)  After reaching an agreement on pricing and contract terms, however, Plaintiff "realized that, due to our efforts to seek the much larger payment from the Congo, we would not have the time and resources to fully perform the contract[s]." (Falkoff Decl. ¶ 40.)  Plaintiff ultimately turned down the first two contracts. (*See* Falkoff Decl. ¶ 44.)

In April 2015, Plaintiff scheduled a meeting in Arizona to finalize and sign a third pre-negotiated contract, which was worth $756,000. (*See* Falkoff Decl. ¶ 47.)  However, prior to the meeting, Defendants contacted Adam Falkoff ("Mr. Falkoff"), President of CapitalKeys, to inform him that another delegation was coming to Washington, D.C. to discuss payment and that Mr. Falkoff "had to stay in Washington." (*Id*.)  After Mr. Falkoff explained that this would cost him another business opportunity, Defendants assured Mr. Falkoff that the delegation would arrive. (*Id*.)  Mr. Falkoff therefore canceled his trip to Arizona. (*Id*.)  Just before the delegation was set to arrive, Defendants informed CapitalKeys that they would not be coming after all. (Falkoff Decl. ¶ 48.)  According to Plaintiff, by that time, "it was too late" for Mr. Falkoff to travel to Arizona to sign the third contract. (*Id*.)

5

In multiple attempts to collect payment over the years, Plaintiff sent nine invoices to Defendants between May 2013 and August 2015. (*See* Compl. ¶ 66.)  During that time, Defendants did not challenge those bills and, instead, continued to make promises of payment during their weekly conversations with Plaintiff. (Compl. ¶ 67; Falkoff Decl. ¶ 32.)

**B.      Legal Action**

On December 23, 2015,[3] Plaintiff filed this action against the Congo and the Central Bank to recover the overdue payment from Defendants. (*See* ECF [4]; Compl. ¶¶ 42–71.) Plaintiff alleges breach of contract, unjust enrichment in the alternative, account stated in the alternative, and loss of business opportunities. (*See* Compl. ¶¶ 2, 42–71.)  Specifically, Plaintiff seeks $16,002,000 for damages under the contract, $5,016,000 for lost business opportunities, at least $2,000,000 for prejudgment interest, and $827.60 for costs. (*See* Compl. ¶¶ 49, 58, 64; Mot. 22, 24–27; Falkoff Decl. ¶ 49.)  That is, Plaintiff requests a Default Judgment in the amount of $21,618,000, plus prejudgment interest and costs. (Mot. 1.)

In February 2016, the Clerk of this Court filed a Certificate of Mailing, certifying that copies of the summonses, complaint, and notice of suit had been sent to Defendants, along with French translations of each. (*See* Certificate of Mailing [15]; Declaration of W. Todd Miller "Miller Decl." [24-2] ¶¶ 5–6.)  Shortly thereafter, Plaintiff filed returns of service for the Congo and the Central Bank, along with proof of delivery showing that both packages were signed for. (*See* Return of Service [18]; Return of Service [19]; Miller Decl. ¶ 6.)

Plaintiff indicates that based on its communication with Defendants, representatives of each Defendant are aware of the lawsuit, and still have simply continued promising imminent

---

[3] Plaintiff originally filed its complaint on December 1, 2015. (*See* ECF [1].)  However, that filing was entered in error.  Plaintiff therefore filed a modified version of its complaint on December 23, 2015 and a summons was subsequently issued. (*See* ECF [4].)  Accordingly, the filing date of the complaint is December 23, 2015.

payment without following through on their promises. (*See* Falkoff Decl. ¶¶ 33–34; Miller Decl. ¶¶ 7-8, Exs. U, V, W, X. [24-23]-[24-26]; Hearing Tr. 37:9–23.)  Despite Defendants' awareness of the lawsuit, Defendants never entered an appearance in this case, so the Clerk of the Court subsequently entered a default against Defendants on April 14, 2016 (*See* Clerk's Entry of Default [22]; Clerk's Entry of Default [23].)

Plaintiff then filed the instant Motion for Default Judgment Against All Defendants. (*See* Mot. 1.)  In its Motion, Plaintiff contends that Defendants are liable for breach of contract, unjust enrichment in the alternative, account stated in the alternative, and loss of business opportunities. (*See* Mot. 7, 15–24.)  Plaintiff also argues that an entry of default judgment in the amount requested is supported by the evidence. (*See* Mot. 7.)

On September 16, 2016, the undersigned held an evidentiary hearing on Plaintiff's Motion (*See* July 26, 2016 Minute Order; Sept. 16, 2016 Minute Entry).  During the hearing, Plaintiff reiterated its request for damages in the amount of $21,618,000, plus prejudgment interest and costs (*See* Hearing Tr. 4:3–7.)  Plaintiff also introduced an exhibit of a December 1, 2015 invoice showing those amounts. (*See* Hearing Tr. 20:3–21.)  In referring the Court to its Motion, Plaintiff argued that its request for damages includes two elements: (1) the liquidated damages amount of $16,002,000 and (2) the consequential or incidental damages, resulting in lost business opportunities. (*See* Hearing Tr. 4:10–23.)  Plaintiff noted that the liquidated damages covered payment for subcontractors, travel, and communication. (*See* Hearing Tr. 12:19–25, 15:15–24.)  Plaintiff also maintained that Defendants are aware of these claims. (*See* Hearing Tr. 37:11–20.)

Mr. Falkoff then testified about Plaintiff's services for Defendants, the reasons for continuing to perform despite Defendants' failure to pay, and the basis for Plaintiff's lost

business damages claim.  He explained that Plaintiff's services for Defendants were primarily to help with "modernizing [the Central Bank's] procedures and the way they did banking and business which would in turn help the overall economy." (Hearing Tr. 7:9–14.)

As for why Plaintiff continued to perform, Mr. Falkoff said Plaintiff relied on Defendants' promises of payment, articulating to the Court that what makes someone pay is the ability to pay, reliance on the promise of payment, and the satisfaction of services. (*See* Hearing Tr. 27:19–25.)  He also explained that this was a services contract, not a goods contract, and that Plaintiff could not just stop services and disrupt the Congo's way of doing business. (*See* Hearing Tr. 29:3–14.)

Regarding Plaintiff's claim for lost business damages, Mr. Falkoff spoke about the three pre-negotiated contracts. (*See* Hearing Tr. 21:20–25, 22:1–2.)  He testified that Plaintiff turned down those contracts because Plaintiff's attempts to collect payment from Defendants was as if Plaintiff took on another client. (*See* Hearing Tr. 25:15–18.)  For the third contract in particular, Mr. Falkoff did not believe anyone else would be as effective in meeting with the visiting delegation because he had the closest relationship with Defendants. (*See* Hearing Tr. 23:1–21.)  Mr. Falkoff further explained that Plaintiff called Defendants about twice per week and sometimes sent an invoice by mail, costing time and money. (*See* Hearing Tr. 38:4–12.)  He also explained Plaintiff's interest in maintaining its good reputation and not "spread[ing] ourselves too thin" by taking on too many clients while trying to collect payment from Defendants. (Hearing Tr. 44:5–9.)

The hearing concluded with Plaintiff explaining that the $16,002,000 amount is owed to Plaintiff regardless of the services or work Plaintiff performed; it is a liquidated amount that parties agreed to pay upon signing the Retainer Agreement. (*See* Hearing Tr. 48:10–25.)

## II.     JURISDICTION

### A.     Subject Matter Jurisdiction

The Foreign Sovereign Immunities Act ("FSIA" or "Act") vests this Court with original jurisdiction over actions against foreign states, so long as the foreign state is not entitled to immunity under the Act's relevant provisions. *See* 28 U.S.C. § 1330(a).  A foreign state is defined under the FSIA to include any political subdivision of the state, or an agency or instrumentality of the state. *See* 28 U.S.C. § 1603(a).  If the entity is an agency or instrumentality of the state, the Plaintiff must demonstrate that the agency or instrumentality is a "separate legal" entity from and an "organ" of the foreign state or, alternatively, that a foreign state or its political subdivision holds a majority ownership interest. 28 U.S.C. § 1603(b). The Plaintiff must also show that the agency or instrumentality of the state is neither a citizen of any state in the United States nor originated under the laws of a third country. *Id*.

Although foreign states are, by default, immune from suit under 28 U.S.C. § 1604, the FSIA provides several exceptions to immunity that, if met, subject the foreign state to suit. 28 U.S.C. §§ 1605, 1607.  Plaintiff points to two such exceptions, arguing that Defendants fall under either one. (*See* Mot. 9, 10 n.1.)  Under the first exception, a foreign state is not immune from this Court's jurisdiction if it has waived immunity, either explicitly or by implication. *See* 28 U.S.C. § 1605(a)(1).  Alternatively, a foreign state may be subject to suit if the activity upon which the action is based is commercial in nature and occurs inside the United States. *See* 28 U.S.C. § 1605(a)(2).

Defendants in this action are both foreign states under the FSIA.  Congo is itself a foreign state, thus qualifying under 28 U.S.C. § 1603(a). (*See* Compl. ¶ 7.)  The Central Bank may be characterized as an agency or instrumentality of the Congo, as it is evidently a separate legal

entity, but acts "as the agent and alter ego of Congo," thus arguably qualifying as an organ of the foreign state. (Compl. ¶ 14.)

Plaintiff asserts that Defendants have implicitly waived their immunity from suit in a manner sufficient under Section 1605(a)(1). (*See* Mot. 9–10.)  This Court has held that a choice of law clause, in which the foreign state agrees that the contract will be governed by the law of a particular country, is sufficient to establish an implicit waiver of immunity. *See Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703, 708–09 (D.D.C. 1985); *Ghawanmeh v. Islamic Saudi Academy*, 672 F. Supp. 2d 3, 9 (D.D.C. 2009) (noting that "there can be no more obvious and implicit waiver of sovereign immunity than the sovereign's express intent to subject itself to the jurisdiction of a foreign court as demonstrated by a choice of law clause within a contract.").

Defendants in this suit signed a contract,  stating that "[t]his Agreement will be governed by the laws of the District of Columbia without regard to principles of conflicts of law and a court in said place shall be the exclusive location for any suit or proceeding relating to this Agreement." (Falkoff Decl. Ex. A at 7.)  Having consented to subject their contractual dealings with Plaintiff to United States law, Defendants have implicitly waived their sovereign immunity under 28 U.S.C. § 1605(a)(1).

Alternatively, immunity may be waived under the theory of commercial activity upon which the action is based. *See* 28 U.S.C. § 1605(a)(2).  A qualifying activity includes either a "commercial activity carried on in the United States by the foreign state," or "an act performed in the United States in connection with a commercial activity of the foreign state." *Id.*  For example, "[c]ontracts for services are generally considered commercial activities when entered into in the United States." *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 50 (D.D.C. 2014).

Authorized representatives from the Congo traveled to Plaintiff's office in Washington, D.C. to "formalize the parties' agreement in writing." (Mot. 10 n.1; *see also* Compl. ¶ 14.)  The contract at issue here was both executed and performed within the United States and thus falls within the first category of a qualifying commercial activity. (*See* Compl. ¶ 14–19.)  As Plaintiff's claim is based upon this activity, immunity may alternatively be waived under 28 U.S.C. § 1605(a)(2).

## B.      Personal Jurisdiction

The FSIA also vests this Court with personal jurisdiction over a foreign state for any claim over which this Court also has subject matter jurisdiction, provided that service was properly made pursuant to 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b).

Section 1608(a)(3), governing service upon the Congo, requires that the Clerk of the Court send a copy of the summons, complaint, and notice to the head of the ministry of foreign affairs, along with a translation of each into the foreign state's official language.  Plaintiff duly submitted copies and translations of each required document to the Clerk of this Court in February 2016. (*See* Certificate of Clerk [15]; Return of Service [18].)  The Clerk sent these documents to Raymond Tshibanda, the head of the Congo's Ministry of Foreign Affairs, and later received confirmation that the package had been signed for. (*See* Mot. 8.)  Thus, service upon Congo was compliant with the requirements under Section 1608(a)(3).

Section 1608(b)(3)(B), governing service upon the Central Bank, requires the same documents and translations to be sent directly to the agency or instrumentality to be served. Service was identically effectuated upon the Central Bank, whose representative also signed for the package. (*See* Certificate of Clerk [15]; Return of Service [19].)  Thus, service upon the Central Bank was equally compliant with the requirements under Section 1608(b)(3)(B).

Service upon both Defendants was proper under Section 1608, and therefore this Court has personal jurisdiction over Defendants under Section 1330(b).

## III.    CHOICE OF LAW

Generally, an FSIA defendant "is subject under the FSIA to federal common law for determining the amount of damages a plaintiff can recover." *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003).  However, the parties to this suit entered an agreement stipulating that the contract "will be governed by the laws of the District of Columbia without regard to principles of conflicts of law and a court in said place shall be the exclusive location for any suit or proceeding relating to this Agreement. " (Falkoff Decl. Ex. A at 7.)

Contractual choice of law provisions are enforceable as long as there is no compelling or countervailing reason making enforcement unreasonable. *Milanovich v. Costa Crociere, S.P.A.*, 954 F.2d 763, 766–67 (D.C. Cir. 1992); c*f. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10–15 (1972) (addressing the enforceability of a forum-selection clause in a contract); *see also* Restatement (Second) of Choice of Laws § 187 (1971).  Choice of law provisions may be found unreasonable if (1) fraud or overreaching induced their formation; (2) the plaintiff is then deprived of his or her day in court; (3) the unfair nature of the chosen law may deprive the plaintiff of a remedy; or (3) their enforcement would conflict with the forum state's strong public policy.  *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996); *Cf. M/S Bremen*, 407 U.S. at 12; *see also* Restatement (Second) of Choice of Laws § 187 (1971).

These concerns are not at issue here.  There have been no allegations of fraud or overreaching, deprivation of rights under District of Columbia state law, or arguments for why public policy dictates using federal common law.  Moreover, Plaintiff regularly cites to District of Columbia state statutes and common law in support of its argument. (*See* Mot. 15–27.)

Accordingly, the law of the District of Columbia should be applied in determining Defendants' liability and Plaintiff's entitlement to damages.

However, in determining whether this Court may ultimately enter a default judgment, the Federal Rules of Civil Procedure and the FSIA govern. *Cf. Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 772 F. Supp. 2d 218, 227 (D.D.C. 2011) (applying the Federal Rules and FSIA provisions to the Court's legal standard for default judgment and standards of proof, even though Israeli law governed both liability and damages); *see also Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 59–60, 65 (D.D.C. 2006) (applying the Federal Rules and FSIA provisions to the Court's legal standard for default judgment, even though Massachusetts state law governed liability).

## IV.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(a), the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." FED. R. CIV. P. 55(a).  Pursuant to Rule 55(b), after the Clerk of the Court has entered a default, a court may, upon the plaintiff's application and notice to the defaulting party, enter a default judgment. FED. R. CIV. P. 55(b)(2). "The determination of whether default judgment is appropriate is committed to the discretion of the trial court." *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).  The standard for default judgment is satisfied where the defendant makes no request to set aside the default and no suggestion that it has a meritorious defense. *J.D. Holdings, LLC v. BD Ventures, LLC*, 766 F. Supp. 2d 109, 113 (D.D.C. 2011) (citing *Int'l Painters &*

*Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008).

Following the entry of default by the Clerk of the Court, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Fanning v. Hotel Mgmt. Advisors-Troy, LLC*, 282 F.R.D. 280, 283 (D.D.C. 2012) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)).  While a default is an admission of the facts cited in a complaint, it is "not an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008).  Moreover, under the Foreign Sovereign Immunities Act ("FSIA"), Plaintiff must "establish[] his claim or right to relief by evidence satisfactory to the court" in order for the Court to enter judgment against a defaulting party. 28 U.S.C. § 1608(e).  Thus, it remains for the Court to determine whether the unchallenged factual allegations constitute a legitimate cause of action.

If liability is established, the court is still "required to make an independent determination of the sum to be awarded unless the amount of damages is certain." *Robinson v. Ergo Solutions, LLC*, 4 F. Supp. 3d 171, 178 (D.D.C. 2014) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)).  Therefore, an "FSIA default winner must prove damages in the same manner and to the same extent as any other default winner." *Hill*, 328 F.3d at 683–84 (internal citations omitted).

To this end, the Court may hold an evidentiary hearing to conduct an accounting, determine the amount of damages, establish the truth of any allegation, or investigate any other matter. FED. R. CIV. P. 55(b)(2). "[D]amages cannot be awarded on the basis of mere speculation or guesswork . . ." *Hill*, 328 F.3d at 684 (internal citations omitted).  The Court, however, "has

14

considerable latitude in determining the amount of damages." *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011); *see also Luna v. A.E. Eng'g Servs., LLC*, 938 A.2d 744, 749 n.19 (D.C. 2007) (allowing the trial court considerable discretion in determining the reasonableness of the requested damages).

## V.    ANALYSIS

### A.    Liability for Breach of Contract

In order to prove Defendants' liability for breach of contract, Plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).  Under this standard, Plaintiff's allegations, taken as true, establish that Defendants breached their contractual obligations.

First, Plaintiff must demonstrate "mutual assent of the parties to all the essential terms of the contract." *Duffy v. Duffy*, 881 A.2d 630, 633 (D.C. 2005).  The contract in this case was "accepted and agreed to" by Jean-Claude Masangu Mulongo, the Governor of the Central Bank. (Falkoff Decl. Ex. A at 7; *see* Compl. ¶ 17.)  For reasons set forth below, the undersigned is persuaded that the Central Bank and the Congo assented to the agreement's essential terms.

Plaintiff notes that under District of Columbia law, an agency relationship exists if there is "evidence of the parties' consent to establish a principal-agent relationship" and "evidence that the activities of the agent are subject to the principal's control." *Jackson v. Loews Washington Cinemas, Inc.*, 944 A.2d 1088, 1097 (D.C. 2008) (quoting *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989)).  As evidence of consent, the Central Bank executed the contract under direct authorization from the President of Congo. (*See* Compl. ¶ 17, Falkoff Decl.

¶ 8.) According to Plaintiff's complaint, negotiation discussions prior to the contract's execution indicated that the Central Bank's assent was dependent on the Congo's authorization, that the Congo would be equally bound by the agreement, and that all contract obligations would be performed "under the control and at the direction of Congo." (Compl. ¶ 14; Falkoff Decl. ¶ 4–5.)

As further evidence of a principal-agent relationship, Defendants' conduct since the parties came to an agreement has similarly reflected this understanding. The first and only payment made by Defendants was ordered by the Office of the President of the Congo, and then executed by wire transfer from the Central Bank. (*See* Compl. ¶ 13, Ex. B at 2; Falkoff Decl. ¶ 3.) Thereafter, in June 2013, a delegate from the Congo visited Plaintiff's office. (Compl. ¶ 25.) Another delegate was sent by the President of the Congo in April 2014 and was thereafter ordered to report directly to the President. (Compl. ¶ 33–37; Falkoff Decl. ¶ 27.) Indeed, most assurances regarding payment came directly from the Congo and the President's Office, rather than from the Central Bank. (*See* Falkoff Decl. ¶ 17.) Moreover, the Congo, not the Central Bank, sent letters thanking Plaintiff for its services, requested updates and progress reports, and benefitted almost exclusively from Plaintiff's performance. (*See* Compl. ¶¶ 31, 34; Falkoff Decl. ¶ 13, 19, 22–26, Ex. C; Mot. 18.)

In short, the undersigned believes both the Congo and the Central Bank consented to establishing a principal-agent relationship and the Central Bank's activities appear to be subject to the Congo's substantial control. As such, there is sufficient evidence in Plaintiff's complaint to establish a valid contract to which all parties assented.

Second, the parties' Retainer Agreement, indeed, placed Defendants under an obligation to compensate Plaintiff for its government relations and communication services in the

remaining amount of $16,002,000, due upon the agreement's execution. (*See* Compl. ¶ 16, Ex. A.)

Third, except for the one-time payment of $600,000 made prior to the formalized agreement, Defendants have failed to make any part of the remaining $16,002,000 payment since signing the agreement on April 18, 2013. (*See* Compl. ¶¶ 13–14, 18, Ex. B.)  This is despite Plaintiff's repeated attempts at collection and Defendants' apparent knowledge of the outstanding debt. (*See* Compl. ¶¶ 23, 26, 66.)  As such, the undersigned concludes that Defendants have been in breach of their obligation to pay $16,002,000 since April 18, 2013, which is when the contract was executed and Defendants' payment became due. (*See* Compl. ¶ 14, Ex. A.)

Fourth, Plaintiff "has been deprived of the use of the money withheld" and has incurred damages as a result of Defendants' breach. *Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1171 (D.C. 2004) (quoting *District of Columbia v. Pierce Assocs., Inc.*, 527 A.2d 306, 311 (D.C. 1987)).  Pursuant to the contract, Plaintiff is owed liquidated damages, which is the remaining $16,002,000 Defendants had to pay, regardless of the services Plaintiff provided. (*See* Hearing Tr. 48:10–25.)  Based on the unchallenged facts, the undersigned believes Plaintiff has satisfied all four elements in establishing Defendants' liability for breach of contract.[4]

**B.     Damages**

Finding Defendants liable for breach of contract, the undersigned turns to the question of damages.  In Plaintiff's Motion for Default Judgment, Plaintiff requests compensatory damages, prejudgment interest, and costs. (*See* Mot. 22–27.)  Specifically, Plaintiff first seeks liquidated damages and damages for lost business, making up its compensatory damages claim of

---

[4] Finding the Defendants liable for breach of contract, the undersigned does not find it necessary to analyze Plaintiff's alternative claims of unjust enrichment and account stated.

$21,618,000. (*See* Mot. 1, 7, 21.)  Second, Plaintiff contends that the Court should award prejudgment interest based on both its liquidated damages and lost business claims. (*See* Mot. 25–27.)  Finally, regarding costs, Plaintiff requests $827.60 for the court filing fee and for its service of process expenses. (Mot. 27; Miller Decl. ¶ 10.)  Each of these damages claims will be addressed in turn.

### 1.  Compensatory Damages

To support its request for compensatory damages, Plaintiff submitted several exhibits, including the parties' Retainer Agreement and an invoice from Plaintiff to Defendants for the initial $600,000 payment. (*See* Falkoff Decl. Ex. A, Ex. B.)  Plaintiff also submitted a declaration from Mr. Falkoff, describing, among other things, the many times Defendants have demonstrated their awareness of both the debt and the lawsuit, as well as their intention to pay the full amount owed to Plaintiff. (*See* Falkoff Decl. ¶¶ 9, 14, 17, 25, 30–32, 34.)  Plaintiff divides its claim for compensatory damages into two subcategories: (1) liquidated damages and (2) lost business damages. For the reasons set forth below, the undersigned recommends awarding liquidated damages and denying lost business damages.

### a.  Liquidated Damages

Having established a valid contract and Defendants' breach thereof, Plaintiff is entitled to the remaining amount owed. *See Vector Realty Grp., Inc. v. 711 Fourteenth St., Inc.*, 659 A.2d 230, 234 n.8 (D.C. 1994).  Plaintiff argues that the remaining $16,002,000 Defendants owe Plaintiff is a liquidated debt. (*See* Mot 25–26.)  A liquidated debt "is one which at the time it arose . . . was an easily ascertainable sum certain." *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 731 (D.C. 2003) (internal quotation marks omitted) (quoting *Dist. of Columbia v. Pierce Assocs. Inc.*, 527 A.2d 306, 311 (D.C. 1987)).

18

There can be little doubt that when Defendants breached their agreement with CapitalKeys on April 18, 2013, they incurred an easily ascertainable debt of $16,002,000. (*See* Falkoff Decl. Ex. A at 5.)  In fact, the agreement, the invoice, and all the correspondence between Plaintiff and Defendants reflect that same amount. (*See* Falkoff Decl. Ex. A, Ex. B.)  Moreover, the contract clearly states that the sum is "due upon signing." (Falkoff Decl. Ex. A at 5.)  Despite Plaintiff's continued prompting and mailing of several invoices, Defendants have not made any portion of this payment to date. (*See* Compl. ¶ 66; Falkoff Decl. ¶¶ 9, 14, 17, 25, 30– 32, 34, Ex. B.)  Thus, this is an action to recover a liquidated debt, and there is sufficient evidentiary basis for awarding the $16,002,000 Plaintiff demands under the agreement.

### b.  Damages for Loss of Business Opportunities

As for Plaintiff's claim for loss of business opportunities, Plaintiff submitted the declaration of Mr. Falkoff, detailing the three pre-negotiated contracts Plaintiff contends it was unable to accept due to Defendants' breach. (*See* Falkoff Decl. ¶¶ 39–50.)  Plaintiff is careful to note that the lost business damages did not arise because of its duties under the contract with Defendants. (*See* Falkoff Decl. ¶ 39; Mot. 23–24.)  Rather, Plaintiff claims its efforts to *recover* payment from Defendants prevented it from ultimately accepting these three contracts. (*See* Falkoff Decl. ¶¶ 39–41, 47–48.)  Plaintiff maintains that because of "using extensive time and resources in seeking the much larger amount due from Defendants," Plaintiff had to forgo its other business opportunities. (Mot. 23.)  The undersigned, however, is not convinced.

Under District of Columbia law, "[t]he doctrine of avoidable consequences, also known as the duty to mitigate damages, bars recovery for losses suffered by a non-breaching party . . . that could have been avoided by reasonable effort and without risk of substantial loss or injury." *Trs. of Univ. of Dist. of Columbia v. Vossoughi*, 963 A.2d 1162, 1178 (D.C. 2009) (internal quotation marks omitted) (quoting *Edward M. Crough, Inc. v. Dep't of Gen. Servs. of D.C.*, 572

A.2d 457, 466 (D.C. 1990)). This doctrine "comes into play *after* a legal wrong has occurred, but while some damages may still be averted, and bars recovery only for such damages." *Vossoughi*, 963 A.2d at 1178 (emphasis in original). As such, "if some of these damages could reasonably have been avoided by the plaintiff, then the doctrine of avoidable consequences prevents the avoidable damages from being added to the amount of damages recoverable." *Foster v. George Washington Univ. Med. Ctr.*, 738 A.2d 791, 795 n.6 (D.C. 1999) (quoting *McCord v. Green*, 362 A.2d 720, 725–26 (D.C. 1976)).

Plaintiff could have avoided these damages by performing on the three pre-negotiated contracts. The first contract, in June 2014, was negotiated between CapitalKeys and the Congo for services unrelated to the contract at issue in this action. (*See* Falkoff Decl. ¶ 40.) The President of the Congo wanted Plaintiff to help with his re-election campaign. (Hearing Tr. 21:22–23.) The parties settled on a monthly price of $110,000 for a 24-month period and had also agreed that the full amount of $2,640,000 would be due up front. (*See* Falkoff Decl. ¶ 40.) The contract was ultimately not executed because, after these comprehensive negotiations, Plaintiff "realized that, due to our efforts to seek the much larger payment from the Congo, we would not have the time and resources to fully perform the contract." (*Id*.)

The second contract, in September 2014, was negotiated between CapitalKeys and Sierra Leone, with the parties agreeing to a payment of $1,620,000, also due up front. (*See* Falkoff Decl. ¶ 41.) In exchange for the payment, Plaintiff would help with an event in London that would ultimately help drive investment into Sierra Leone. (Hearing Tr. 21:23–25, 22:1–2.) Just as with the first contract, CapitalKeys turned down this 36-month contract after negotiations had concluded, again citing the "immense efforts" it was expending on seeking payment from Defendants. (*See* Falkoff Decl. ¶¶ 41, 43–44.)

The third contract was negotiated in April 2015 between CapitalKeys and a mining company in Arizona. (*See* Falkoff Decl. ¶¶ 47–48.)  As before, the parties settled on a seemingly comprehensive set of terms and agreed to a one time up-front payment of $756,000 for services rendered over an 18-month period. (*See* Falkoff Decl. ¶ 47.)  Mr. Falkoff scheduled a meeting in Arizona to finalize the agreement, but he later cancelled this meeting because he was informed that a delegation from the Congo would be coming to see Plaintiff at the same time. (*Id.*)  On the day before the delegation was set to arrive, however, the Congo informed Mr. Falkoff that the delegation would not be coming. (*See* Falkoff Decl. ¶ 48.)  According to Mr. Falkoff, "it was too late to meet with the mining company," and Plaintiff was thus ultimately unable to accept this contract. (*Id.*)

After reviewing evidence relating to these three contracts, the undersigned concludes there is insufficient evidentiary basis for awarding the $5,016,000 Plaintiff demands for loss of business opportunities.

First, Plaintiff has not provided the Court with copies of the three pre-negotiated contracts or any other documents illustrating Plaintiff's lost business damages involving the three contracts.  Instead, during the evidentiary hearing, Plaintiff pointed the Court to the declaration given by Mr. Falkoff as evidence of the three contracts. (*See* Hearing Tr. 42:24–25, 43:1–15.)  Without more evidence, such as copies of the contracts or any other proof of the negotiations behind the set prices and duration of the work, the Court would be taking part in "mere speculation or guesswork" without having even a reasonable estimate of data. *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 352 (D.C. 2015).

Second, even if Defendants had provided more evidence of the three pre-negotiated contracts, the undersigned believes Plaintiff's lost business opportunities were reasonably

avoidable since Plaintiff could have ceased its performance immediately after Defendants failed to pay Plaintiff upon signing the Retainer Agreement on April 18, 2013.  However, Plaintiff argues that this was a services contract and not a goods contract, so it could not just stop its performance and disrupt Defendants' way of doing business. (*See* Hearing Tr. 11:11–22.)  The undersigned does not believe the distinction between a goods contract and a services contract plays any importance here.  In fact, the parties' agreement contains a provision, stating that "[f]ailure by Client to pay subsequent professional service and expense fees, if required by this agreement and according to the schedule outlined above, will result in suspension of work by CK for Client." (Falkoff Decl. Ex. A at 5.)

Moreover, at the time of the first contract in June 2014, about fourteen months had elapsed since Defendants' failure to pay in April 2013, arguably amounting to a material or even total breach of the agreement on Defendants' part. (*See* Falkoff Decl. ¶¶ 1, 40); *see also, e.g.*, *3511 13th St., LLC v. Lewis*, 993 A.2d 590, 592 (D.C. 2010); *Siegel v. Banker*, 486 A.2d 1163, 1165 (D.C. 1984) ("[T]he failure by one of the parties to perform his part of the obligation within the time prescribed discharges the other from all liability under the contract.").  During these fourteen months, Defendants repeatedly assured Plaintiff that payment was forthcoming and repeatedly failed to follow through with these promises. (*See* Falkoff Decl. ¶¶ 9, 14, 16–17, 22–32, 34.)  Yet, according to the contract, it was when Defendants failed to make the initial payment that Plaintiff should have ceased its performance.

Even if Defendants' immediate failure to pay in April 2013 had not alarmed Plaintiff, and even if their repeated empty promises over the course of the following year had not given Plaintiff pause, Defendants' multiple self-imposed conditions on Defendants' existing performance obligation—such as the need for a positive progress report— should have indicated

that payment was neither imminent nor certain. *See generally Sisco v. GSA Nat'l Capital Fed. Credit Union*, 689 A.2d 52, 57 n.5 (D.C. 1997) (citing the fundamental principle that a "promise to perform pre-existing duties [is] not sufficient consideration to alter obligation"). Instead, by its own admission, Plaintiff continued "putting faith in the continued promises and reassurances of representatives of the Congo that payment was imminent." (Falkoff Decl. ¶ 51.)

Third, Plaintiff's claim that it did not have time to perform on any other contracts while it was attempting to collect payment from Defendants lacks support. Plaintiff contends that the amount of time and resources it spent prevented Plaintiff from performing other work because it was as if Plaintiff had taken on another client in trying to get Defendants to make payment. (*See* Falkoff Decl. ¶¶ 36–46; Hearing Tr. 25:14–24.) However, Plaintiff's accounts regarding its efforts are inconsistent. Plaintiff said "[i]t was a *daily* effort to communicate with [Defendants] and figure out what was going on over there as to why there was a delay in our payment." (Hearing Tr. 25:22–24) (emphasis added). Contrary to that, Mr. Falkoff stated that "[Plaintiff] speak[s] with them probably twice a week," costing about $50 a week to call over there and take on this "continuous separate project." (Hearing Tr. 38: 4–12.) If Plaintiff has to send an invoice, it would do that as well.[5] (*Id.*)

Yet, Plaintiff found the time to pre-negotiate each of the three contracts, and even formalized their payment structure. (*See* Falkoff Decl. ¶ 39–41, 47.) All three of the negotiations for these contracts occurred during the same time period Plaintiff was attempting to collect its overdue payment from Defendants. (*See* Falkoff Decl. ¶¶ 39–49.) Therefore, the undersigned is not convinced that Plaintiff was not able to perform on these contracts.

---

[5] Plaintiff did not send an invoice every week but, rather, sent a total of nine invoices between May 12, 2013 and August 5, 2015. (Compl. ¶ 66.) Similar to the telephone calls, sending invoices to Defendants was also not a daily effort.

Fourth, regarding the third pre-negotiated contract, it is possible Plaintiff had other options besides cancelling Mr. Falkoff's meeting in Arizona and waiting in Washington, D.C. for the delegation to arrive.[6]   After Defendants assured Plaintiff that a delegation would arrive, Mr. Falkoff admittedly "canceled [his] trip to Tucson because receiving the overdue payment . . . was more important to [their] business than a much smaller contract." (Falkoff Decl. ¶ 47.)   Mr. Falkoff claims that, once the delegation informed Plaintiff that they were no longer coming, it was "too late" to go to Arizona and meet with the mining company. (Falkoff Decl. ¶ 48.)   Mr. Falkoff contends that, as a result, Plaintiff lost the contract. (Mot. 14.)

However, Plaintiff's suggestion that not showing up to the meeting resulted in the complete dissolution of the pre-negotiated contract is troublesome.   After all, Plaintiff and the mining company participated in negotiations and subsequently decided on a comprehensive set of terms whereby Plaintiff would assist the mining company with governmental affairs over an 18-month period in exchange for an up-front payment of $756,000. (Falkoff Decl. ¶ 47.)   Following their oral agreement, Mr. Falkoff scheduled a trip to Tucson, Arizona to meet with the mining company's chief executive officer and sign the contract. (*Id*.)   That is, all that was left to do in order to finalize the contract, worth almost three quarters of a million dollars, was to find the time to go to Arizona and sign the agreement.

Despite Defendants alerting Plaintiff the day before their scheduled arrival that they were no longer visiting, it is hard to believe Plaintiff had no other option for executing the contract with the mining company when everything but the signing of the contract was already finished.

---

[6] Plaintiff did not sufficiently explain why Mr. Falkoff could not delegate authority for another person to attend the meeting in Arizona or, alternatively, for another person to meet with the visiting delegation. (Hearing Tr. 15:2–25, 16:1–23, 17:4–19, 22:3–25, 23:1–21, 24:3–25, 25:1–10; *see also* Falkoff Decl. ¶¶ 47–48.)   Instead, Mr. Falkoff stated that he decided to take a "calculated risk" in staying in Washington, D.C. to meet with the delegation, but he did not answer the Court's question of why someone else could not go to Arizona to finalize the other contract. (Hearing Tr. 22:23–25, 23:1–21.)

It is also not clear to the undersigned why Plaintiff could not authorize another person to travel to Arizona to sign the agreement or why, alternatively, Mr. Falkoff could not find another day or another flight in order to both welcome the delegation and go to Arizona.  Given the importance Plaintiff places on its reputation, it is difficult to understand why Plaintiff knowingly, and admittedly, jeopardized its pre-negotiated contract with the mining company when it could have made efforts to meet with the visiting delegation and with the mining company. (*See* Hearing Tr. 24:10–19.)  Regardless of its reasoning, Plaintiff cannot then allege Defendants are responsible for Plaintiff's inaction with the third contract.

The undersigned believes it was unreasonable for Plaintiff to continue efforts to collect payment and accrue damages at the expense of accepting existing pre-negotiated contracts. Moreover, the undersigned is not convinced that Plaintiff's efforts to secure payment were so taxing that they prevented Plaintiff from performing contracts that Mr. Falkoff is "confident" it would have otherwise been able to perform. (Falkoff Decl. ¶ 42.)  Plaintiff has not sufficiently proven that, were it not occupied with placing phone calls and sending invoices to Defendants, it surely would have had the time required to perform under these contracts. (*See* Falkoff Decl. ¶ 37.)  The alleged lost business from the three contracts was thus not only reasonably avoidable, but the very existence of the loss is uncertain.  As this Court may not award damages "based on mere speculation or guesswork," the undersigned does not recommend awarding Plaintiff damages for loss of business opportunities. *Havilah Real Prop. Servs., LLC* at 108 A.3d 352.

### 2. Prejudgment Interest

Prejudgment interest is "an element of complete compensation to a creditor for the loss of use of money that a debtor wrongfully withholds." *Dist. Cablevision Ltd. P'ship v. Bassin*, 828

A.2d 714, 732 (D.C. 2003) (internal quotation marks omitted) (quoting *Riggs Nat'l Bank of Washington, D.C. v. Dist. of Columbia*, 581 A.2d 1229, 1253 (D.C. 1990)).

Under D.C. Code § 15–108, Plaintiff is entitled to recover prejudgment interest in an action to recover a liquidated debt,[7] if interest is payable by contract, law, or usage. *See Bassin*, 828 A.2d at 731. However, district courts have wide discretion in terms of awarding prejudgment interest. *See Burke v. Groover, Christie & Merritt, P.C.*, 26 A.3d 292, 304–05 (D.C. 2011); *see also Fed. Mktg. Co. v. Virginia Impression Products Co., Inc.*, 823 A.2d 513, 531–33 (D.C. 2003); *Riggs*, 581 A.2d at 1256; *House of Wines, Inc. v. Sumter*, 510 A.2d 492, 499 (D.C. 1986). Here, Plaintiff seeks prejudgment interest for its liquidated damages, as well as for its damages relating to loss of business opportunities.

### a.   Prejudgment Interest on Liquidated Damages

Plaintiff argues that prejudgment interest should be awarded based on custom and usage. (*See* Mot. 25.) Both this Court and District of Columbia courts have noted that in breach of contract cases, "it is indeed customary to pay interest on funds that are withheld and not paid when due." *Bragdon*, 856 A.2d at 1172 (citations omitted); *see also Bassin*, 828 A.2d at 731.

Plaintiff also contends that "Defendants are culpable in the delay as they have consistently insisted that they would be paying . . . in full on many, many occasions." (Mot. 26.) However, the undersigned does not believe this is entirely accurate. While it is indeed customary to award prejudgment interest when a party withholds funds, it is surely not customary for Plaintiff to delay litigation for almost two years after the other party breaches the contract, as is what happened in this case. (*See* Hearing Tr. 37: 22–25.) Plaintiff explains that it

---

[7] Although D.C. Code 15–109 also applies here, being that it is a breach of contract claim, the undersigned does not address that Section after already recommending that Plaintiff's compensatory damages claim be categorized as a liquidated debt. Accordingly, the undersigned refers to D.C. Code 15–108 since that Section particularly addresses interest on a liquidated debt.

took "a lot of heartfelt searching . . . and hesitation . . . before Mr. Falkoff decided to resort to the U.S. courts." (Hearing Tr. 31: 22–24.) Moreover, Plaintiff claimed the decision to delay litigation was one that Mr. Falkoff made "as a business person." (Hearing Tr. 35:11–21.) It is clear to the undersigned that, while the D.C. Code supports the award of prejudgment interest on liquidated debt, this situation where Plaintiff causes unwarranted delay contradicts the intent of the statute.

Therefore, the undersigned believes Plaintiff should receive prejudgment interest, but the interest should begin to accrue at the time Plaintiff filed its complaint, rather than at the time Defendants failed to pay upon signing the contract. That is, the undersigned believes "the equities in this case do not support an award of prejudgment interest from the date of the first violation . . . but rather favor an award beginning on a later date." *Kansas v. Colorado*, 533 U.S. 1, 14 (2001); *see also Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983) (determining "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the [plaintiff] has been responsible for undue delay in prosecuting the lawsuit").

Further, even if Plaintiff can persuade the Court that its delay is understandable, "there is no doubt that the interests of both [parties] would have been served if the claim had advanced promptly after its basis became known." *Kansas*, 533 U.S. at 16. Additionally, it was "uniquely in [Plaintiff's] power to begin the process by which those damages would be quantified." *Id*.

Accordingly, the undersigned believes Plaintiff is entitled to $16,002,000 in compensatory damages. Moreover, since breach of contract cases are typically accompanied by an award of prejudgment interest, the undersigned recommends that Plaintiff is also entitled to prejudgment interest based on custom and usage, with the interest starting to accrue at the date

the complaint was filed, rather than when the injury occurred, due to Plaintiff's unwarranted delay in bringing suit for the breach.

Unless fixed by contract, the rate of interest for forbearance of money under D.C. Code § 28–3302 is calculated at six percent per annum. This should be awarded as simple, rather than compound, interest because the contract does not include any provision regarding the issue. When the agreement is silent on the issue of awarding simple or compound interest, courts generally do not award compound interest. *See Allen v. Yates*, 870 A.2d 39, 51 (D.C. 2005) (holding that "because the parties did not provide for compound interest, interest . . . should be calculated on the principal balance alone"); *see also Rastall v. CSX Transp., Inc*., 697 A.2d 46, 53 (D.C. 1997) (determining that, "[a]bsent a contractual provision, prejudgment and judgment interest are not usually compounded").

From December 23, 2015, when Plaintiff filed the complaint, to the present day, the unpaid balance on the liquidated amount remains at $16,002,000. (*See* Mot. 22.)  Defendants thus owe $881,207.45 in prejudgment interest during this time period, calculated at six percent per annum.[8]  In sum, to date, Defendants owe Plaintiff $16,002,000 for the principal, plus $881,207.45 for interest on the unpaid balance, totaling $16,883,207.45.

### b.  Prejudgment Interest on Lost Business Opportunities

Plaintiff also seeks prejudgment interest on the damages for loss of business opportunities. (*See* Mot. 25.)  As discussed earlier, the undersigned does not believe Plaintiff is entitled to lost business damages, so this request is moot.

However, even if the Court awards Plaintiff damages for the unexecuted contracts, the undersigned recommends that it is improper to award prejudgment interest on the lost business

---

[8] This is the amount of prejudgment interest through the date this Report and Recommendation was filed.

damages. While the lost business perhaps constitutes an easily ascertainable sum insofar as the contracts had been pre-negotiated for set prices, these additional damages are not a part of the liquidated debt Plaintiff seeks to recover, as required under D.C. Code § 15-108. Moreover, Plaintiff has not pointed to any case or otherwise demonstrated that it is customary to pay interest on lost business damages. (*See* Mot. 25–27.) Rather, prejudgment interest serves to compensate Plaintiff "for the loss of use of money that a debtor wrongfully withholds." *Bassin*, 828 A.2d at 732. With its lost business claim, Plaintiff does not seek to recover money that Defendants wrongfully withheld and is thus not entitled to prejudgment interest on the lost business damages.

### 3. Costs

Plaintiff asks the Court to award $827.60 in costs, consisting of a $400.00 court filing fee and $427.60 for service of process expenditures. (Miller Decl. ¶ 10, Ex. Z. [24-28]) Under FED. R. CIV. P. 54(d), "costs—other than attorney's fees—should be allowed to the prevailing party." A party who prevails under a default judgment is equally entitled to costs incurred in the prosecution of this action. *See Limbach Co., LLC v. Ten Hoeve Bros., LLC*, 126 F. Supp. 3d 105, 109–110 (D.D.C. 2015). Accordingly, the undersigned recommends that Plaintiff be awarded those costs that qualify under 28 U.S.C. § 1920, which includes fees of the Clerk and Marshal.

### VI.    RECOMMENDATION

Based on consideration of the record, pleadings, exhibits entered into evidence, and the testimony given at the hearing, the undersigned recommends that the Court issue a Default Judgment in favor of Plaintiff CapitalKeys, LLC against Defendants Democratic Republic of Congo and Central Bank of the Democratic Republic of the Congo. The undersigned further recommends the Court award Plaintiff $16,002,000 in compensatory damages, $881,207.45 in

prejudgment interest on the principal unpaid balance, and $827.60 for costs.  Thus, the recommended total award should be $16,884,035.05, plus any remaining prejudgment interest, at an annual interest rate of six percent as simple interest, after the date of this Report and Recommendation.

## VII.    REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).


DATED: _____11/21/2016_____          _____/s/_____
                                        ALAN KAY
                                        UNITED STATES MAGISTRATE JUDGE